ARISTOCRAT LAKEWOOD NURSING HOME, Appellant,

v.

MAYNE, Appellee.

[Cite as *Aristocrat Lakewood Nursing Home v. Mayne* (1999), 133 Ohio App.3d 651.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 73328.

Decided May 17, 1999.

*Timothy N. Toma Co., L.P.A.,* and *Timothy N. Toma,* for appellant.

*McCarthy, Lebit, Crystal & Haiman Co., L.P.A.,* and *Joshua B. Nathanson,* for appellee.

KARPINSKI, Judge.

Plaintiff-appellant, Aristocrat Lakewood Nursing Home ("nursing home"), appeals from a judgment against it on claims to recover payment from defendant-appellee Joan Mayne for long-term nursing care bills.

In its suit against Mayne, the nursing home alleges that when she sold her parents' house she improperly took all her stepfather's assets, before deserting him, penniless and ineligible for Medicaid, and burdening the nursing home with substantial unpaid nursing home bills. Mayne argued to the contrary that she was well-intentioned, took care of her mother, and was entitled to the couple's assets under an agreement with them even though her stepfather was never able to live with her.

Mayne's elderly mother, Emily Wolf, and elderly step-father, Nelson Wolf, who were married for approximately 45 years, lived in a jointly owned residence in Cleveland. According to Mayne, her mother, Emily, who was 93 years of age, became concerned about Nelson, who was approximately 81 years of age, because he was "not competent" and both needed help. They had discussions about moving to Tulsa, Oklahoma, where Mayne and her husband lived in a residence at 59th Place. Nelson was reluctant to move there.

In November 1993, Nelson suffered "a series of strokes" and was hospitalized at the Veterans Administration ("VA") hospital. In late December 1993, when Emily was living alone, Mayne and her husband, a paralegal, drove to Cleveland.

On December 20, 1993, Mayne, her husband, and mother went to the VA hospital, where the Wolfs executed a "General Power of Attorney" appointing Mayne to act on their behalf. Mayne sold the Wolfs' house for $15,000 in cash the following day. After they packed her mother's possessions, including the funds from the mother's joint checking account with Nelson, they left for Tulsa on December 23, 1993. Nelson remained hospitalized in Cleveland at the VA hospital.

On December 24, 1995, Emily moved into the Maynes' existing 59th Place residence in Tulsa while Mayne was refurbishing a second house she purchased four months earlier on South Florence. Two days later, on December 27, 1993, Mayne deposited the $15,000 proceeds from the sale of the Wolfs' house in a bank certificate of deposit in her own name. Mayne rerouted Nelson's social security check, which Emily and Nelson had previously shared, to Emily in Tulsa and established for Emily and Mayne a joint checking account in which Mayne claimed a fifty percent ownership interest. Emily also continued to receive her own social security check.

The South Florence house which Mayne had allegedly purchased for the Wolfs to live in, was "a super deal" and cost only $2,500 down. She paid approximately $7,500 over several months to paint and refurbish it. The remaining debt for the purchase price was $35,000.[1] On May 27, 1994, Emily paid the monthly payment of $405 due on the note for the South Florence property. The following month, the Maynes sold their original residence on 59th Place and moved into the South Florence residence. Emily continued sharing living expenses with the Maynes throughout this period.

Even before his strokes, the loss of his house, and the transfer of all his assets and income, Nelson had modest means. The VA program for veterans, like the Medicaid program for the general public, requires demonstrated economic need, but has less stringent financial criteria for eligibility. The fact that the VA paid for any of Nelson's medical expenses, arising from a stroke at age 81 for a nonservice connected disability, demonstrated that he had few disposable assets even for his nonmedical, personal needs.[2]

The VA made a social work service report on January 27, 1994, near the end of his stay at the VA hospital.[3] It summarized the VA's efforts to obtain a guardian for Nelson to look after his interests because he had been left alone in Cleveland by his family. Apart from Nelson's medical needs, the report recognized the VA's dilemma concerning his placement because "he is here alone without funds, clothes, or a home." Mayne assured the VA that she would move Nelson to Tulsa to join them within weeks in the Spring.

On February 4, 1994, near the date when Mayne indicated that Nelson was originally expected to go to Tulsa, he was transferred from the VA hospital directly to the nursing home. Payment was guaranteed to the nursing home on a VA contract for a period of up to 180 days. Nelson never went to Tulsa and stayed intermittently in the nursing home until his death sixteen months later. See fn. 22, *infra.*

---

1. Mayne paid off the debt with certificates of deposit. These certificates of deposit did not include the certificate of deposit Mayne funded with the proceeds from the sale of the Wolfs' residence.

2. Veterans benefits are not an entitlement program; they are based on a priority system. If a veteran suffers from a nonservice connected disability, he must generally qualify for medical benefits under income guidelines. 38 C.F.R. 17.47. Provisions governing VA facilities and private nursing homes are set forth in 38 U.S.C. 1710 and 1720, respectively. Nursing home care is generally provided to qualified veterans for six months, *id.*, 38 C.F.R. 17.56, but can be extended for up to forty-five days under certain limited circumstances. 38 C.F.R. 17.60.

3. We refer to this document, which is in the record, because the trial court's opinion quotes from it, although it was never introduced into evidence. It was attached to Mayne's affidavit in support of summary judgment, which was also not presented during trial but relied upon by the trial court. See fn. 7, *infra.*

During his stay at medical facilities in Cleveland, Nelson had no funds for personal expenses. There is no evidence that he had any funds while at the VA hospital, and the VA documented efforts to obtain funds for him prior to his discharge. On January 27, 1994, Mayne informed the VA that Emily was entitled to keep Nelson's social security checks—in addition to her own—"while he is on a VA Contract," but that Mayne would send Nelson $50. Although there is no indication that Nelson ever received these funds, Mayne ultimately sent two checks, each for $7, directly to the nursing home to pay for two haircuts.[4]

Mayne testified that by Spring 1994 she knew that Nelson would never move to Tulsa because of his condition. The VA paid for the entire 180–day period of long-term care charges incurred by Nelson at the nursing home through August 8, 1994, pursuant to the VA contract. Even after the expiration of the VA contract, and despite her knowledge that Nelson would not move to Tulsa, however, Mayne never offered to return the money she had taken from him for housing in Tulsa so that he could pay his own bills for housing, medical, or personal expenses in Cleveland.

Mayne testified that she knew, before Nelson's VA contract lapsed, that he had to qualify for Medicaid to obtain assistance in paying his nursing home bills. On July 8, 1994, before the VA contract elapsed, Mayne completed an application for Medicaid on Nelson's behalf under the "General Power of Attorney." Following treatment at another medical facility, Nelson was later readmitted to the nursing home, on a "Medicaid pending" status.

Approximately one year after Mayne originally stated that Nelson would join her in Tulsa, after the Department of Human Services made several requests for further information from Mayne, and after several months of bills had been incurred, the Medicaid application was denied. Nelson was found to be ineligible for Medicaid because his residence had been sold and none of the proceeds had been used to pay his medical expenses. After the Department of Human Services reportedly referred the matter to the prosecutor's office, Mayne continued to retain the proceeds and accumulated interest from the sale of the Wolfs' house and renewed the certificate of deposit until she cashed it "a couple years" later to buy herself a recreational vehicle.

---

**4.** A check for $50 was drawn January 28, 1994, by Mayne payable to herself on her own Tulsa bank account. The memo line stated "for Nelson Wolf." There is no indication that Nelson received the proceeds either in the VA hospital or the nursing home where he was transferred within a week.

The remaining two checks were drawn on the joint account established by Emily and Mayne in Tulsa and funded with the proceeds from the Wolfs' joint account in Cleveland and with social security checks. Both checks were made payable by Mayne directly to Aristocrat Lakewood for $7 and contained the memo line "haircut (Nelson)." The checks were dated approximately two and four months into his sixteen-month stay.

The nursing home's complaint indicated that a second application for Medicaid benefits, filed March 1, 1995, was denied, effective ten days after Nelson's death, for failure to cooperate in verifying the value of resources. No appeal was taken. Fortunately, Medicare, which deducted the premium from his social security check before it was rerouted to Emily in Tulsa, covered some of his nursing home expenses. Some of his expenses were also satisfied by his own social security checks, which were restored to him in September 1994, one month after the termination of the VA contract. Nelson died on June 18, 1995, leaving an unpaid itemized balance owed to the nursing home of $16,311.32, for long-term nursing care services, underwear, and haircuts.

In a four-count complaint filed against Mayne, the nursing home alleged tort claims of conversion, fraudulent conveyance, breach of fiduciary duty, and negligence. It sought to recover the debt owed to it, along with punitive damages, attorney fees, and other relief. The trial court granted summary judgment for Mayne on all the nursing home's claims except the claims for fraudulent conveyance, punitive damages, and attorney fees, which proceeded to a bench trial.

The nursing home presented testimony from (1) Mayne as if on cross-examination, (2) its bookkeeper, Michelle Mroczka, (3) its social worker, Nancy Yantok Quigley, and (4) attorney John Manley concerning the reasonableness of attorney fees incurred in pursuing its claims.

During the case in chief, Mayne testified that her mother Emily lived with her in Tulsa for approximately two years before she—like Nelson—suffered a stroke, was hospitalized for two months, and was then discharged into a nursing home for long-term care. At the time of trial, Mayne and her husband continued to live in the South Florence residence with all improvements and additions.[5] Emily had lived in the house, which they bought when she was 93 years of age, only "for over a year, maybe close to two"; Nelson never lived there.

Mayne denied any knowledge that the Department of Human Services had referred the matter concerning Nelson's Medicaid application to the County Prosecutor because of the sale of his residence and her retention of the proceeds. In the Medicaid application Mayne completed for Emily at the end of 1995, Mayne stated under penalty of perjury that Emily never sold any house, that

---

5. The Maynes bought and renovated real estate. In addition to the $15,000 Mayne received from the sale of the Wolfs' residence in Cleveland, Mayne stated she sold several of her own properties for the following prices: $113,000 for the 59th Place residence in Tulsa, $108,000 for a condominium in Palm Springs, over $200,000 for property in Springfield, Massachusetts, and $220,000 for a residence in Hacienda Heights, California. Currently, she was receiving approximately $1,200 per month in payments from the property sales in Springfield, Massachusetts, and Hacienda Heights, California.

Emily paid rent to Mayne while staying at her residence, and that Emily never owned or transferred property. Mayne subsequently recanted all these statements and, under oath, testified to the contrary at trial.

Mroczka, the nursing home's bookkeeper, testified concerning the unpaid $16,311.32 in goods and services the home provided to Nelson and the $13,269.50 in attorney fees and costs it incurred in pursuing collection of this debt. The nursing home's social worker, Yantok Quigley, testified concerning the circumstances of Mayne's completion of a Medicaid application for Nelson, the criteria for Medicaid eligibility, and the subsequent denial of reimbursement for the unpaid nursing care costs because of the sale of the Wolfs' residence and refusal to use any of the proceeds to pay the bills.[6]

Quigley informed Mayne that the matter had been referred to the local prosecutor and made contemporaneous notes about this matter. Quigley also clarified that Nelson could have qualified for Medicaid if Mayne had spent only $6,000 of the $7,500 from his share of the Cleveland residence sale proceeds on his medical bills. Attorney John Manley, called as an expert, testified that both the fees and hours expended by the nursing home's counsel in the probate and common pleas courts to recover the resulting $16,311.32 debt were reasonable.

After the denial of her motion for dismissal of the nursing home's claims, Mayne testified on her own behalf. She originally planned for Nelson and Emily to move to Tulsa, she said, and accepted the $15,000 from the sale of their house in return for providing them a place to live in Tulsa. She stated that she never expected Nelson to go into a nursing home. His condition became worse and he was never able to move to Tulsa. She emphasized that she had given notice of her sale of the Wolfs' house before he was admitted into the Nursing Home. During her deposition, she stated that the reason she obtained the "General Power of Attorney" was "to sell the house, and pay their bills." At trial, however, she denied this authority to pay Nelson's bills. She signed Nelson's Medicaid application "Joan Mayne, stepdaughter—POA."

She admitted she knew by the Spring of 1994 that Nelson would be unable to move to Tulsa. She stated she believed the VA would take care of Nelson, but knew by June or July 1994 that the VA would no longer pay for his nursing care.

---

**6.** Detailed Medicaid eligibility requirements are set forth in R.C. Chapter 5111 and O.A.C. 5101:1–39. Applicants for Medicaid do not qualify if they have more than $1,500 worth of "countable resources." O.A.C. 5101:1–39–05(A)(8). At the time of the transaction in the case at bar, the Department of Human Services "looked back" for a period of thirty months before the application was made to determine whether an applicant transferred assets to enable him to meet these eligibility limits. O.A.C. 5101:1–39–077. If applicants made an improper transfer, for example, by receiving less than the fair market value for an asset, O.A.C. 5101:1–39–073(B), applicants are rebuttably presumed to be ineligible until they spend down their assets to the $1,500 limit, O.A.C. 5101:1–39–072, or the ineligibility period expires.

She also admitted she never intended to send any money to the nursing home, even after she knew Nelson was never going to move to Tulsa. She explained, "[h]e wanted his wife taken care of. If he was in his right mind, he would have wanted me to do exactly what I did."

The trial court entered judgment against the nursing home in favor of Mayne on its claims for fraudulent conveyance, punitive damages, and attorney fees. The nursing home timely appeals raising four assignments of error.

The nursing home's first assignment challenges the trial court's disposition of its fraudulent conveyance claims as follows:

"The trial court erred in concluding that Joan Mayne's retention of the proceeds from the sale of Nelson Wolf's home did not constitute a fraudulent conveyance under the provisions of Ohio Rev. Code § 1336.04. Conclusion of Law Nos. 1, 6, 9, 10, 11, 12."

This assignment is well taken in part.

The nursing home argues that the trial court improperly entered judgment against it on its fraudulent conveyance claims. It argues, *inter alia*, that the trial court relied on obsolete law and did not address its constructive fraud claim. Under the circumstances, we are compelled to agree.

■ An examination of the trial court's opinion reveals that it did not answer the central question presented by this case: whether there was an actual or constructive intent to defraud the nursing home as a *future creditor*. The nursing home's complaint alleged this precise claim under R.C. 1336.04. It is well established that a trial court may not simply ignore or "decide not to decide" difficult issues. *Taylor v. Taylor* (1981), 2 Ohio App.3d 79, 80, 2 OBR 87, 88–89, 440 N.E.2d 823, 824.[7]

The kindred laws of fraud and fraudulent conveyances define the extreme boundaries of fair dealing with others. The law governing fraudulent conveyance claims has been a mix of statutory and common law. Over the past forty years, fraudulent conveyance claims in Ohio have been subject to two different bodies of legislation. *Profeta v. Lombardo* (1991), 75 Ohio App.3d 621, 624, 600 N.E.2d 360, 362. The General Assembly adopted the Uniform Fraudulent Conveyance Act ("UFCA") in 1961. More recently, however, effective in 1990, the General

---

7. The findings of fact and conclusions of law adopted by the trial court were prepared by defense counsel. The cover letter shows no indication they were circulated to opposing counsel in compliance with Com.Pl.Loc.R. 19. Moreover, certain fact findings are not supported by the evidence presented at trial. For example, dates appear to be taken from Mayne's affidavit supporting her summary judgment motion. Likewise, quotes of a letter from the VA to Mayne were not introduced into evidence, but were relied upon by the trial judge.

Assembly repealed the UFCA and adopted, in its place, the Uniform Fraudulent Transfer Act ("UFTA"). *Id.*

Unfortunately, the trial court in the case at bar did not cite a single case involving the new UFTA legislation and, because of changes made by the new law, its citations to older cases under the UFCA misconstrued and misapplied the current version of R.C. 1336.04 in the case at bar. The trial court's opinion stated:

"To have a remedy under the Ohio Uniform Fraudulent *Transfer* Act on a theory that the challenged transfer rendered the debtor insolvent, the debtor [*sic*, creditor] must have a claim against the debtor both at the time of the challenged transfer and at the time the fraudulent conveyance action was brought." (Emphasis added.)

This statement, like several others denominated by the trial court as "conclusions of law," is erroneous as a matter of law.[8]

Unlike the former R.C. 1336.04 (under the UFCA), the current R.C. 1336.04 (under the UFTA) was specifically amended in 1990 to expand coverage of its substantive provisions. It now covers claims of actual and constructive fraud against both existing and *future* creditors.[9] R.C. 1336.04 specifically provides:

"(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, *whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred,* if the debtor made the transfer or incurred the obligation in either of the following ways:

"(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

"(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

"(a) *The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small* in relation to the business or transaction;

---

**8.** The case cited by the trial court recognizes this fact when the court says: "[T]he right to a remedy under former § 1336.04 is generally believed to be available only to a creditor which was owed both at the time of the transfer and at the time the action is brought * * *." *In re Structurlite Plastics Corp.* (Bankr.S.D.Ohio 1995), 193 B.R. 451, 458. (Emphasis added.) Other conclusions of law reached by the trial court are likewise erroneous as discussed below.

**9.** Former R.C. 1336.04 under the UFCA provided as follows: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Other provisions of the UFCA governed claims against future creditors, but none of them were as broad as current R.C. 1336.04(A)(2). See former R.C. 1336.05–1336.07.

"(b) *The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay* as they became due." (Emphasis added.)

There is no dispute that the nursing home qualifies as a future creditor in the case at bar because Nelson did not owe any debt to it at the time of the challenged December 21, 1993 transfer to Mayne. See *In re Bushey* (C.A.6, BAP 1997), 210 B.R. 95, 104 (reversing summary judgment for a debtor in a case alleging actual fraud against a future creditor who extended credit two years after the debtor transferred her house to her daughter). Actual intent to hinder, delay, or defraud future creditors is explained in R.C. 1336.04(A)(1), and constructive intent to hinder, delay, or defraud future creditors is explained in R.C. 1336.04(A)(2).

### Actual Intent to Hinder, Delay, or Defraud

It is difficult to prove actual intent to hinder, delay, or defraud, because it requires proving an actor's mental state and because the key witnesses are frequently insiders hostile to the claim. Centuries of experience have revealed, however, that persons desiring to hinder, delay, or defraud creditors by placing themselves in a collection-proof condition tend recurringly to use the same or similar devices. These so-called "badges of fraud," which support an inference of actual fraud, are now codified in R.C. 1336.04(B):

"(B) In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, *including, but not limited to,* the following:

"(1) Whether the transfer or obligation was to an insider;

"(2) Whether the debtor retained possession or control of the property transferred after the transfer;

"(3) Whether the transfer or obligation was disclosed or concealed;

"(4) Whether before the transfer was made or the obligation was incurred the debtor had been sued or threatened with suit;

"(5) Whether the transfer was of substantially all of the assets of the debtor;

"(6) Whether the debtor absconded;

"(7) Whether the debtor removed or concealed assets;

"(8) Whether the value of consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

"(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

"(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

"(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor." (Emphasis added.)

 One paragraph of the trial court's conclusions of law in the case at bar listed only eight of these eleven statutory factors, and another paragraph found that only one of its truncated list of factors was present in the case at bar.[10] The trial court's opinion completely omitted subsections (4) and (5), ignored relevant parts of subsections (9) and (10), and failed to consider law that contradicted its findings concerning subsection (8), even though R.C. 1336.04(B) provides eleven specified factors for consideration.

The most notable omission in the trial court's opinion was its failure to determine "*[w]hether the transfer was of substantially all of the assets of the debtor*" under R.C. 1336.04(B)(5). The record shows that the proceeds from the sale of the Wolfs' residence were Nelson's sole asset, except for any clothes he had and the balance in the Wolfs' joint checking account, which Mayne also took to Tulsa. Mayne admitted that Nelson had no other assets. Literally, Nelson was left penniless after the December 21, 1993 transfer of proceeds to Mayne and the rerouting of his future income from social security checks to Emily in Tulsa.

In addition, although the trial court stated that Nelson was not insolvent[11] at the time of the transfer, it inexplicably did not consider whether he "*became insolvent shortly after the transfer was made*" under R.C. 1336.04(B)(9). The record does not show that Nelson had any funds for personal expenses while he was in the VA hospital at the time of the December 21, 1993 transfer of proceeds from the sale of the residence. After taking all his assets and future income during her trip to Cleveland, Mayne stated that—"out of the goodness of [her] heart"—she gave him $50, more than one month later. See n. 4, *supra.* Even if

---

**10.** The evidence supports the trial court's finding that the first badge of fraud under R.C. 1336.04(B)(1) existed: Mayne was an "insider" because she was a relative of Nelson, the debtor. R.C. 1336.01(G)(1)(a) and (K).

**11.** There are two basic definitions of insolvency. The balance sheet approach determines whether assets exceed liabilities, whereas the equitable test looks at cash flow and whether the debtor has an ability to pay debts as they become due. The related concept of "unreasonably small assets," which is broader and may exist even without insolvency, is discussed *infra.*

It is not clear which definition of insolvency the trial court used in this context. Its assertion that Nelson was not "insolvent" at the time of the December 21, 1993 transfer because "he had no debts" ignores undisputed evidence in the record. At the time Mayne sold the Wolfs' house and kept the proceeds, Emily and Nelson jointly owed, at a minimum, real estate taxes and water and sewer bills for the property. Nelson was left with no funds to pay these debts and Mayne did not pay them until days thereafter.

Nelson received this payment, there is evidence that he appeared insolvent by February 10, 1994, six days after he was transferred to the nursing home, because he obtained a haircut on that date and did not pay the bill as it became due. Finally, although Mayne directly sent the nursing home two checks for a total of $14 to pay for two haircuts early in his stay, Nelson was unable to pay for approximately six more haircuts or numerous pairs of underwear he needed. The absence of any ready cash for such minor personal needs is a clear sign of his insolvency.

Also notably absent from the trial court's opinion was any finding concerning *"[w]hether the transfer occurred shortly before * * * a substantial debt was incurred"* under R.C. 1336.04(B)(10). The trial court's conclusions of law mentioned this statutory factor, but the opinion made no finding concerning this particular badge of fraud.[12] Much of the evidence described above is also relevant to this issue.

The record shows that the transfer of proceeds from the sale of the residence occurred within weeks of Nelson suffering a disabling series of strokes that required immediate hospitalization for two months, followed by a series of discharges and re-admissions to a nursing home for long-term care over a period of sixteen months. At a minimum, Nelson was transferred from the VA hospital to the nursing home, where he incurred a substantial debt, beginning on February 4, 1994, approximately six weeks after the transfer to Mayne of the proceeds from the sale of his house.[13]

Finally, the trial court's statement that "[t]he value of the consideration received by [Nelson] was *'reasonably equivalent'* to the value of the asset transferred" under R.C. 1336.04(B)(8) ignores governing law. Mayne received $15,000 from the Wolfs, who had an undivided joint interest in the proceeds. The South Florence house cost $10,000 with improvements when Emily moved in. Emily paid at least one payment on the note for the property and some rent when she lived there. Nelson never lived there and Emily lived there for less than two years. When all was said and done, Mayne retained the South Florence house with all improvements as well as the proceeds from the sale of the Wolfs' house.

---

**12.** It may also be that the December 21, 1993 transfer "occurred shortly after a substantial debt was incurred" to the extent that Nelson was primarily liable for any medical or other expense incurred following his admission into the VA hospital in November 1993. The record does not clarify the earlier circumstances of his stay at the VA hospital.

**13.** The patient receiving necessary medical services is primarily liable for the cost of such services, particularly when some third party-payor, such as Medicaid, does not pay them. See, *e.g., Cuyahoga Cty. Hosp. v. Price* (1989), 64 Ohio App.3d 410, 581 N.E.2d 1125.

We recognize the benefit of care to Mayne's mother. However, as noted in Mayne's own case law, value must be measured from the standpoint of Nelson, the debtor. *In re Structurlite Plastics Corp.* (Bankr.S.D.Ohio 1995), 193 B.R. 451, 456.[14] There was no evidence that Nelson received any direct personal benefit from the South Florence residence. R.C. 1336.03(A) specifically provides that *"value does not include an unperformed promise* made otherwise than in the ordinary course of the business of the promisor *to furnish support to the debtor or another person."* Accord 11 U.S.C. 548(A)(2).

The trial court found that Nelson also received additional consideration because Mayne traveled to Cleveland and became attorney-in-fact under the "General Power of Attorney." All that Mayne did in this role, however, was to sell Nelson's only asset to a purchaser the Wolfs had found and retain the proceeds in a highly self-interested transaction with no tangible benefit to Nelson. As noted by the nursing home, a 100% commission is manifestly excessive. Even if Nelson derived a benefit from this entire exchange, the record does not show that such benefit was reasonably equivalent to the value surrendered by Nelson. According to the trial court's valuation, he gave up a certain asset of $7,500, while 81 years of age and hospitalized with a series of strokes, in return for a highly contingent potential opportunity to rent a home from Mayne in Tulsa.

Not only did the trial court fail to adequately consider all factors specified by R.C. 1336.04(B), but it failed to account for additional evidence supporting a claim of actual fraud in the case at bar. R.C. 1336.04(B) expressly provides that the trial court's consideration of actual intent to hinder, delay, or defraud is *"not limited to"* the statutory factors. The case at bar appears to be one of the comparatively rare cases when there is evidence, beyond the statutory "badges of fraud," which may indicate such an actual intent by or on behalf of Nelson.

The record contains evidence that may indicate a broader scheme, both before and after Nelson became a patient at the nursing home, that the nursing home may have been fraudulently induced to extend credit or deceived about its ability to obtain reimbursement. The entire transaction is accompanied by little, if any, documentation and repeatedly changing stories, including self-contradictory statements made under oath at a time when they would advance current pecuniary interests.

As the trial court quoted from the January 27, 1994 VA social work service report, the nursing home was informed that Mayne *"used the money from the*

---

**14.** Moreover, *Structurlite Plastics* also recognizes that the measure of value should not include items, such as housing, to the extent that separate consideration, such as rent, is paid for them. *Id.*

*sale of the [Wolfs'] house to purchase another home in Tulsa for the couple.*" [15] This statement was untrue because it was revealed subsequently that Mayne, in fact, used the $15,000 proceeds she received on December 21, 1993, to buy a $15,000 certificate of deposit in her name six days thereafter. Mayne agreed at trial that "[n]o part of the $15,000 was used to purchase that house." The deed reveals that, despite her marriage, Mayne, as a single person, purchased the South Florence residence more than four months before the sale of the Wolfs' residence. The statement in the report appears misleading concerning the Wolfs' interest in the property for the purpose of determining both Nelson's eligibility to obtain Medicaid coverage and the nursing home's ability to collect from Emily, who was subject to a claim of liability under R.C. 3103.03 for necessaries provided to Nelson, her spouse. [16]

The specter of fraud is supported by Mayne obtaining a "General Power of Attorney" from a person who was hospitalized and admittedly not competent, and by her use of that power to engage self-interested transactions that had little or no prospective or actual benefit to him and that prevented him from being able to pay his creditors. Mayne's admittedly false statements in the Medicaid applications, and subsequent failure to spend down the funds she received from Nelson when she knew he was unable to move to Tulsa, may indicate a pre-existing scheme or intent to hinder, delay, or defraud his medical creditors. [17]

Without further commenting on the totality of the evidence, we find that the record contains sufficient evidence to raise a question of fact under R.C.

---

15. See fn. 3, *supra.*

16. The nature of the Wolfs' interest in the Tulsa house affected the nursing home's ability to be reimbursed for long-term care charges. Once the Wolfs' Cleveland residence was converted into cash, the proceeds from the sale were "countable resources" for purposes of determining his Medicaid eligibility. O.A.C. 5101:1–39–27. The proceeds would not be counted only if he satisfied the "home replacement exclusion." O.A.C. 5101:1–39–314. This exclusion applies when the applicant uses the proceeds to purchase another exempt home and the proceeds are used or obligated to purchase a substitute home within three months of receipt.

Mayne's statement conveys the impression that the case at bar would fall within the scope of this exclusion to enable Nelson to qualify for Medicaid coverage. Nelson, however, could not have qualified for the home replacement exclusion in the case at bar because the proceeds from the sale of his house were not used to purchase the house on South Florence in Tulsa.

Mayne's statement that the Tulsa house was "in Mrs. Mayne's name" may also have given a further false impression. This statement suggests that the property may have been held in trust for the Wolfs. At trial, however, Mayne revealed that neither of the Wolfs ever had an interest of any kind in the property. Because Emily had no interest, life estate, or even a lease despite paying rent, the nursing home had no asset from which it could collect its claims against her for necessaries provided to Nelson, her spouse.

17. We find, contrary to the trial court's conclusions of law, that the evidence of Mayne's failure to spend down the assets is relevant to the nursing home's fraudulent conveyance claims.

1336.04(A)(1) concerning the existence of actual intent to hinder, delay, or defraud the nursing home as a future creditor in the case at bar. During trial, the court properly recognized this because it did not dismiss the claim. The trial court subsequently found, however, that because only one badge of fraud existed, it was not required to shift the burden of proof to Mayne to explain the transaction.

■ The Fifth District Court of Appeals reversed the dismissal of a fraudulent conveyance claim under similar circumstances in *Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio* (1987), 37 Ohio App.3d 162, 524 N.E.2d 915. The *DiMazzio* court recognized that the trial court misallocated the burden of proof when the record contained evidence of several badges of fraud as in the case at bar. *Id.* at 167, 524 N.E.2d at 919–920. As noted above, the record in the case at bar contains evidence relating to at least four badges of fraud other than the one found by the trial court, and the trial court did not make adequate findings concerning them. These findings are necessary to a proper allocation of the burden of proof. Because there are factual disputes concerning these issues, we decline to enter judgment as a matter of law on the fraudulent conveyance claims as this court did enter in *Cleveland Metro. Gen. Hosp. v. Oleksik* (1987), 38 Ohio App.3d 21, 23, 525 N.E.2d 831, 832–833. Rather, we reverse and remand for further consideration.[18] See *Cresho v. Cresho* (1994), 97 Ohio App.3d 5, 11, 646 N.E.2d 183, 187.

## Constructive Intent to Hinder, Delay, or Defraud

■ Current R.C. 1336.04(A)(2) expands the scope of recovery beyond prior law and permits claims for constructive fraud against future creditors. Unlike actual fraud under R.C. 1336.04(A)(1), constructive fraud under R.C. 1336.04(A)(2) focuses more on the effect of the transaction rather than the intent with which they were undertaken. Constructive fraud may exist even when the debtor has no actual intent to hinder, delay, or defraud an existing or future creditor. The trial court's opinion, however, makes no express findings concerning this claim. It does not mention the term "constructive fraud" or even purport to apply R.C. 1336.04(A)(2) governing such claims. As noted above, the trial

---

18. The trial court's findings that Nelson did not retain control of the house sale proceeds under R.C. 1336.04(B)(2), and did not conceal the transfer of his assets under R.C. 1336.04(B)(3) and (7) do not preclude a finding of actual intent in the case at bar. Cases involving health care transactions near the end of life may be different from garden-variety fraudulent conveyance claims. Because the creditor does not rely solely on the debtor's credit for payment in the health care context, disclosing the existence of a transfer does not by itself fully protect the creditor. Moreover, the debtor in this context may seek to benefit insiders by giving them assets outright rather than retaining a concealed interest in them for himself.

court cannot simply ignore or "decide not to decide" an issue. *Taylor v. Taylor, supra.*[19]

The relevant consideration in the case at bar is whether without receiving a reasonably equivalent value in exchange for the transfer, Nelson either (1) "was about to engage in a * * * transaction for which the remaining assets of the debtor were unreasonably small," or (2) "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." R.C. 1336.04(A)(2)(a) and (b), respectively. The record in the case at bar contains evidence from which a reasonable trier-of-fact could find (1) that the transfer of all Nelson's assets and future income left him with unreasonably small assets, $0, when he was about to engage in a transaction with a long-term nursing care facility, and/or (2) that he or Mayne, his agent, intended, believed, or reasonably should have believed that he would incur debts beyond his ability to pay. See, *e.g., Waukesha Cty. Dept. of Social Serv. v. Loper* (1972), 53 Wis.2d 713, 193 N.W.2d 679.

The intent necessary to constitute a fraudulent conveyance under R.C. 1336.04(A)(2)(b) is different from the actual intent to hinder, delay, or defraud required to establish a claim under R.C. 1336.04(A)(1). Thus facts that do not satisfy a claim of actual intent could still satisfy a claim under (A)(2)(b). Moreover, even if a debtor did not have a subjective intent or belief that he would incur debts beyond his ability to pay, there is a question of whether he reasonably should have believed that he would do so.

The unreasonably small asset theory under R.C. 1336.04(A)(2)(a) is the broadest kind of fraudulent conveyance claim. It applies to future creditors and does not require proof of any mental state by the debtor whatsoever. This provision applies when the debtor is left with unreasonably small assets, compared to his historical level of assets or cash flow and current needs. It applies when he is about to conduct a transaction, even if the debtor was not rendered technically insolvent by the transfer. Care must be taken when applying this provision, however, not to invalidate all transfers simply because a debtor subsequently happened to encounter financial problems.

According to her own testimony, Mayne believed that Nelson was in sufficiently good health at the time of the transfer to give rise to the inference that she knew he would probably outlive his assets of $0 if he had a single nonmedical personal expense at any time during the remainder of his life after he were left

---

19. To the extent that the trial court's omission was based on its conclusion that the nursing home had to be an existing creditor at the time of the transfer or that Nelson received a reasonably equivalent value in exchange for his transfer to Mayne, these arguments are unpersuasive for the reasons stated above.

alone without funds in Cleveland. See *St. Clare Ctr., Inc. v. Mueller* (1986), 34 Ohio App.3d 69, 71, 517 N.E.2d 236, 238–239. Even if Nelson had been able to obtain reimbursement from the VA, Medicaid, Medicare, or some other form of public assistance for his long-term nursing care charges as Mayne argued, there is absolutely no evidence that any of these programs would have covered his nonmedical personal expenses for items such as haircuts and underwear in the case at bar.[20]

Moreover, given the current and widely recognized pressures of medical cost containment, it should not come as a surprise to anyone that a hospital would discharge a patient to a lower cost facility as soon as medically feasible. Mayne stated that Nelson would not be able to join her in Tulsa until Spring and he was transferred before that time on February 4, 1994, to the nursing home. Under the circumstances, a factfinder could conclude that the transfer of all Nelson's assets, while he was hospitalized after a disabling series of strokes, was made in contemplation of his becoming, or was made when it was reasonably foreseeable that he would become, a debtor to the nursing home.

This case is distinguishable from *Crocker v. Ryan* (Tenn.App.1995), 914 S.W.2d 551, which arose under the former Uniform Fraudulent Conveyance Act. The patient in *Ryan* was hospitalized for a serious illness at age seventy-one at the time that she granted her daughter power of attorney. The daughter quickly transferred her mother's home to herself and a brother. The patient, however, retained Medicare, supplemental insurance, and $10,000 in savings and received a monthly pension of $1,000.

The patient survived her hospitalization and one month later was transferred to a nursing home, where she incurred substantial charges. Most of the nursing home bills were paid on her behalf through insurance, and her attorney-in-fact also paid a significant amount of the remaining debt. The court found the transfer of the home could not be set aside as an improper fraudulent conveyance, because no one expected the patient "to live long enough to incur debts in excess of the $10,000 she had in the bank." *Id.* at 554. The case at bar differs from *Ryan* because Nelson was completely stripped of all his assets and left with absolutely no reserve fund of any kind to meet any reasonably foreseeable expenses.[21]

---

**20.** Federal and state law recognize a minimum personal needs allowance of $40 per month for individual nursing home residents. 42 U.S.C. 1396a; R.C. 5111.113; O.A.C. 5101:1–39–223(C).

**21.** The fraudulent conveyance claim in *Crocker* was rejected under several different theories: (1) The nursing home was not an existing creditor at the time of the transfer. See former R.C. 1336.04, but compare current R.C. 1336.04(A).

There are legal methods by which property may be protected from the expenses of long-term health care. The complicated task becomes significantly more complicated, however, when it is not undertaken until the need has become imminent. When obtaining goods or services on credit, one can avoid claims of fraud of any kind provided he deals fairly with his current and future assets and liabilities, does not misrepresent his financial condition or provide misleading or untrue information, and has no fraudulent purpose, preconceived scheme not to pay, or lack of reasonable expectation of being able to do so.

As noted above in the context of the nursing home's claim of actual fraud under R.C. 1336.04(A)(1), we decline to resolve any factual disputes or express any opinion on the merits of its claims of constructive fraud under R.C. 1336.04(A)(2)(a) and (b) and remand the matter to the trial court for further proceedings. See *Cresho v. Cresho, supra.*

Accordingly, the nursing home's first assignment of error is sustained in part.

The nursing home's second assignment follows:

"The trial court erred in failing to conclude that Mayne's retention of the proceeds of the sale of Nelson Wolf's home, causing the denial of his medicaid eligibility, was relevant regarding the proper measure of damages arising from Mayne's fraudulent transfer. Conclusion of Law No. 12."

This assignment is well taken in part.

The nursing home argues that the trial court improperly denied its claims against Mayne for compensatory and punitive damages and attorney fees. It also argues that the measure of compensatory damages is not limited to the amount of the fraudulent transfer, if any, made in the case at bar.

The record shows that the trial court declined to award any damages because it concluded that no fraudulent transfer occurred. Because we reversed the trial court's disposition of the fraudulent conveyance claim under the first assignment of error, we necessarily reverse its consequent determination not to award any damages. If, on remand, the trial court finds that a fraudulent transfer was made, it should make an award of appropriate damages.

We agree with the nursing home's argument that, in appropriate cases, a creditor setting aside fraudulent conveyance may recover compensatory damages, in addition to punitive damages and attorney fees, upon satisfying applicable law

---

(2) There was no actual intent to defraud the nursing home as a future creditor. See former R.C. 1336.07; compare current R.C. 1336.04(A)(1).

(3) There was no intent or belief that the patient would incur debts beyond her ability to pay. See former R.C. 1336.06; compare current R.C. 1336.04(A)(2)(b).

(4) Apparently, the property remaining in her hands after the transfer was not unreasonably small. See former R.C. 1336.05; compare current R.C. 1336.04(A)(2)(a).

governing such remedies. *Locafrance U.S. Corp. v. Interstate Dist. Serv., Inc.* (1983), 6 Ohio St.3d 198, 6 OBR 252, 451 N.E.2d 1222. R.C. 1336.07 generally describes remedies in fraudulent conveyance actions and provides:

"(A) In an action for relief arising out of a transfer or an obligation that is fraudulent under section 1336.04 * * * of the Revised Code, a creditor, subject to the limitations in section 1336.08 of the Revised Code, may obtain one of the following:

"(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the claim of the creditor;

"* * *

"(3) Subject to the applicable rules of equity and in accordance with the Rules of Civil Procedure, any of the following:

"* * *

"(c) Any other relief that the circumstances may require."

R.C. 1336.10, in turn, supplements the law governing fraudulent conveyance actions with general legal principles outside the Chapter 1336 Uniform Fraudulent Transfer Act, and provides as follows:

"Unless displaced by this chapter, the principles of law and equity, including, but not limited to, the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement the provisions of this chapter."

Applying these legal principles to the case at bar is difficult because the trial court has not found the relevant facts and we can provide only limited guidance. In many cases, as set forth in R.C. 1336.07(A)(1), the maximum measure of recovery to compensate an injured creditor would be the amount of the fraudulent transfer because that amount would equal the amount of the loss caused by the fraudulent transfer. However, at its core, the guiding principle is compensation. Depending upon the facts and circumstances of a particular case, the amount of the fraudulent transfer may either under or overcompensate the injured creditor.

For example, it is well established that "[a] person injured by fraud is entitled to such damages as will fairly compensate him for the wrong suffered; [*sic* ] that is, the damages sustained by reason of the fraud or deceit, and which have naturally and proximately resulted therefrom." *Foust v. Valleybrook Realty Co.* (1981), 4 Ohio App.3d 164, 166, 4 OBR 264, 267, 446 N.E.2d 1122, 1126; *Locafrance, syllabus, supra.* ("Common-law remedies, including the law of fraud, may be applied when appropriate in fraudulent conveyance cases * * *.")

In such a case, to the extent that the amount of the fraudulent transfer does not adequately compensate the injured creditor for its loss, it does not provide the appropriate measure of recovery. R.C. 1336.07(A)(3)(c); R.C. 1336.10.

Mayne emphasizes the converse situation, when the amount of the fraudulent transfer would overcompensate the injured creditor. R.C. 1336.08 specifically limits the recovery by a creditor under such circumstances and provides:

"(B)(1) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under division (A)(1) of 1336.07 of the Revised Code, *the creditor may recover a judgment for the value of the asset transferred,* as adjusted under division (B)(2) of this section, *or the amount necessary to satisfy the claim of the creditor, whichever is less.* * * *

"(2) If the judgment under division (B)(1) of this section is based upon the value of the asset transferred, the judgment shall be in an amount equal to the value of the asset at the time of the transfer, *subject to adjustment as the equities may require.*" (Emphasis added.)

The trial court must apply these principles on remand if it finds that a fraudulent transfer occurred in the case at bar. We note that the amount of the alleged fraudulent transfer in the case at bar was an undivided one-half interest in the $15,000 proceeds from the sale of the house. Under the circumstances, the measure of compensation to which the nursing home is entitled upon a finding that a fraudulent conveyance occurred is not *per se* limited to $7,500 as argued by Mayne. The measure of damages may be further complicated by issues of causation in the case at bar because Nelson was admitted and readmitted several times, including after his original Medicaid application was denied.[22]

Finally, the Ohio Supreme Court has also recognized that punitive damages and attorney fees may be awarded when appropriate in fraudulent conveyance cases. *Locafrance,* at 202–203, 6 OBR at 255–256, 451 N.E.2d at 1225–1226. In a case involving the former Uniform Fraudulent Conveyance Act, the court specifically recognized that merely "[s]etting aside the conveyance and other remedies set forth in R.C. 1336.10 and 1336.11 would not be a sufficient deterrent to discourage appellants and other debtors from making fraudulent conveyances to avoid creditors." *Id.* The nursing home in the case at bar presented some evidence to support its claims.

The punitive damage claim in the case at bar is governed by R.C. 2315.21. To recover punitive damages, the nursing home must not only establish

---

**22.** Nelson was admitted and re-admitted to the nursing home after treatment at other facilities under at least seven separate admission agreements. These agreements, executed on various dates, were attached to the complaint.

the underlying cause of action for the fraudulent transfer, but must also show that the debtor acted with actual malice when making the fraudulent transfer. *Locafrance,* at 201–202, 6 OBR at 254–256, 451 N.E.2d at 1224–1226. "Actual malice" requires proving that the debtor acted in the form of either (1) hatred, ill will, or a spirit of revenge, or (2) a conscious disregard for the rights of others that had a great probability of causing substantial harm. *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. The aggravated mental state of actual malice is distinct from the mental state, if any, necessary to establish the underlying fraudulent conveyance. *Locafrance, supra;* see also *Spalding v. Coulson* (Sept. 3, 1998), Cuyahoga App. Nos. 70524 and 70538, unreported, 1998 WL 564054.[23]

 As noted above under the first assignment of error, to the extent that Mayne's retention of the house sale proceeds is part of a fraudulent scheme, such evidence is relevant both to support the nursing home's claim for compensatory damages resulting from the fraud and to establish the existence of actual malice to support its claim for punitive damages. We decline, however, to adopt the nursing home's argument that it is entitled to an award of damages, because such a determination must be made by the trial court in the first instance. As a result, we reverse and remand for further proceedings and an appropriate award of damages if the trial court finds that a fraudulent conveyance occurred in the case at bar.

Accordingly, the nursing home's second assignment of error is sustained in part.

The nursing home's third assignment challenges the summary judgment on its breach of fiduciary duty and negligence claims as follows:

"The trial court erred in dismissing Aristocrat Lakewood Nursing Home's claims of negligence and breach of fiduciary duty on summary judgment."

This assignment lacks merit.

 The nursing home argues that the trial court improperly entered judgment in favor of Mayne on its claims for breach of fiduciary duty and negligence. It asserted in the trial court that Mayne was liable to it by virtue of her alleged breach of her duties to Nelson. Its arguments were vague and have been specified only slightly more on appeal.

---

23. For the sake of clarity, we also summarize the applicable burdens of proof. The "clear and convincing evidence" standard applies to proving both the existence of an actual or constructively fraudulent transfer and sufficient actual malice to recover punitive damages; the "preponderance of the evidence" standard applies to proving the existence and amount of compensatory damages. See, *e.g., Household Fin. Corp. v. Altenberg* (1966), 5 Ohio St.2d 190, 34 O.O.2d 348, 214 N.E.2d 667.

Mayne's motion for summary judgment argued, *inter alia,* that the nursing home produced no authority to establish that she owed a duty toward the nursing home or evidence to support such a claim even if such a duty existed.

█ Under the circumstances, we have no hesitation in rejecting the nursing home's claim for breach of fiduciary duty. The nursing home seeks derivatively to impose personal liability against Mayne for any breach of fiduciary duty she may have committed against Nelson as his attorney-in-fact. It is true that an attorney-in-fact has a fiduciary duty toward his principal. See, *e.g., In re Scott* (1996), 111 Ohio App.3d 273, 276, 675 N.E.2d 1350, 1352. However, the nursing home has not shown how any such duty of the attorney-in-fact to her principal extends to it as a third party to that relationship.

█ At most, the relationship between that of the nursing home and Nelson was that of debtor and creditor. The Ohio Supreme Court has repeatedly held that, without more, the relationship of debtor and creditor does not constitute a fiduciary relationship. See, *e.g., Stone v. Davis* (1981), 66 Ohio St.2d 74, 78, 20 O.O.3d 64, 66–67, 419 N.E.2d 1094, 1097–1098 (citing *Umbaugh Pole Bldg. Co. v. Scott* [1979], 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320.) A fiduciary relationship arises only when the parties, by contract or less formal relationship, understand that a special trust or confidence has been reposed. *Id.*

No such understanding between any parties was alleged or established in the case at bar. Because Nelson did not owe any fiduciary duty to the nursing home, and the nursing home has not shown any independent basis for establishing such a relationship directly with Mayne, it has not shown that it can recover against Mayne derivatively on this theory.

█ We reject the nursing home's claim of negligence for similar reasons. In support of this claim in the trial court the nursing home cited a case that involved a pre-existing independent duty by a real estate agent to the purchasers not to commit fraud or misrepresent the facts when selling them a house. *Youngpeter v. Lucas* (Mar. 9, 1992), Van Wert App. No. 15–91–12, unreported, 1992 WL 52749. Recognizing an actionable claim against the real estate agent, in addition to the property vendors, the court stated:

"As is true with respect to employees generally, the liability of the agent is based on the duty which he himself owes to the third person * * *. Pursuant to this test of liability, an employee or agent is liable to a third person for injuries resulting from the breach of any duty which the employee or agent owes directly to such third person, and is not liable to a third person for injuries resulting from a breach of duty which the employee or agent owes only or solely to his employer." (Citation omitted.) *Id.* at 2–3.

The nursing home did not allege or establish that Mayne owed it an independent duty in the case at bar. As in *Youngpeter*, Mayne is not liable to the nursing home for any breach of duty that she owed only or solely to Nelson. We decline to categorically hold that a creditor could never establish the existence of an actionable duty of care to a creditor under these circumstances. The nursing home, however, failed to present such a claim in this case.[24]

■ The nursing home's citation to R.C. 1337.092, governing an attorney-in-fact's personal liability for his principal's debt, does not alter this result. It is not clear that this statute, effective on October 1, 1996, approximately three years after the challenged transaction, applies in the case at bar. Even if the statute merely codifies common law principles of personal liability for a representative acting under a power of attorney as the nursing home argues, however, we reject its fiduciary duty and negligence claims as those claims were articulated in the case at bar.[25]

■ Finally, citing *Schaefer v. D&J Produce* (1978), 62 Ohio App.2d 53, 16 O.O.3d 108, 403 N.E.2d 1015, in its brief on appeal, the nursing home seeks to resuscitate its theory by arguing that the basis for its negligence claim against Mayne was that Mayne breached a duty Nelson delegated to her. Because the nursing home did not expressly raise this "delegation of duty" argument in the trial court, such a claim of error is deemed to be waived, and we decline to express any opinion on this belatedly raised theory. See *Matter of Estate of Crabtree* (Iowa 1996), 550 N.W.2d 168, 171.

Accordingly, the nursing home's third assignment of error is overruled.

The nursing home's fourth assignment argues that the trial court improperly rejected its claim of breach of implied contract as follows:

"The trial court erred in failing to recognize Aristocrat Lakewood's claim of breach of implied contract."

This assignment lacks merit.

The nursing home argues that the trial court improperly denied its belated motion to amend its complaint to add a new claim and a new party. Its motion, filed eleven days before the commencement of trial, sought to assert a breach of

---

24. The nursing home's citation to *In re Edenburg* (May 4, 1995), Cuyahoga App. No. 67064, unreported, 1995 WL 264598, is equally unpersuasive. *Edenburg* involved a motion to surcharge a bond filed by a guardian in the probate court. The claims, parties, and circumstances differ in the case at bar. Contrary to the nursing home's argument, *Edenburg* did not establish a general principal that a party helping to file a Medicaid application could be held personally liable to a nursing home.

25. R.C. 1337.092 is set forth in the Appendix.

implied contract claim against Nelson's wife, Emily. It also argues that its original complaint, which expressly raised four distinct tort claims, sufficiently stated a claim for breach of implied contract against Mayne.

This court recently evaluated a similar claim by a litigant seeking to belatedly inject a new issue into the proceedings on the eve of trial under similar circumstances in *Lalak v. Crestmont Constr. Inc.* (Jan. 14, 1999), Cuyahoga App. No. 72567, unreported, 1999 WL 13961:

"The Ohio Supreme Court has summarized the principles governing appellate review of a trial court's denial of a motion to amend a complaint:

"This Court's role is to determine whether the trial judge's decision was an abuse of discretion, not whether it was the same decision we might have made. *State, ex rel. Wargo v. Price* (1978), 56 Ohio St.2d 65, 10 O.O.3d 116, 381 N.E.2d 943. Not only is our role limited to review, but the review itself has narrow limits:

"'* * * We have repeatedly held that [t]he term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 126, 482 N.E.2d 1248, 1252. *Wilmington Steel Products, Inc. v. Cleveland Electric Illuminating Co.* (1991), 60 Ohio St.3d 120, 122, 573 N.E.2d 622, 624–625; see also *Easterling v. Am. Olean Tile Co., Inc.* (1991), 75 Ohio App.3d 846 [600 N.E.2d 1088] (collecting cases); *Meadors v. Zaring Co.* (1987), 38 Ohio App.3d 97 [526 N.E.2d 107].

"To constitute a reversible abuse of discretion under this standard, the trial court's ruling must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias. *Nakoff v. Fairview Gen. Hosp.* (1996), 75 Ohio St.3d 254, 256 [662 N.E.2d 1, 3–4]. Reviewing the record in compliance with this stringent standard, we find that plaintiffs have failed to show an abuse of discretion." *Id.* at 4–5.

We reach a similar conclusion in the case at bar. As in *Lalak* and *Wilmington,* the trial court in the case at bar could properly find that the two-page motion for leave to file an amended complaint, filed eleven days before the scheduled trial, was not timely filed.

By the time the motion was filed, the action had already been pending for approximately one year, and discovery had been completed for more than three months. Extensive proceedings had already been conducted on the merits of the original complaint; in fact, the trial court granted summary judgment on three of four tort claims originally pleaded the following day. Under the circumstances,

the trial court could properly reject the attempt to interject a new issue and party into the proceedings.

 Our examination of the nursing home's original complaint likewise reveals that it did not sufficiently raise a claim for breach of implied contract against Mayne or anyone else. The complaint specifically raised four tort claims, but never even mentioned the word "contract." Even modern liberal pleading standards have limits and require some notice of the claims to be litigated. Finally, contrary to the nursing home's argument, an implied contract claim must be sufficiently raised in the complaint and cannot be raised in a brief in opposition to summary judgment.

Accordingly, the nursing home's fourth assignment of error is overruled.

The judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings.

*Judgment accordingly.*

DYKE, P.J., concurs.

ROCCO, J., concurs in judgment only.

### APPENDIX

R.C. 1337.092 provides as follows:

"(A) If an attorney in fact enters into a contract in the representative capacity of the attorney in fact, if the contract is within the authority of the attorney in fact, and if the attorney in fact discloses in the contract that it is being entered into in the representative capacity of the attorney in fact, the attorney in fact is not personally liable on the contract, unless the contract otherwise specifies. If the words or initialism attorney in fact, as attorney in fact, AIF, power of attorney, POA, or any other word or words or initialism indicating representative capacity as an attorney in fact are included in a contract following the name or signature of an attorney in fact, the inclusion is sufficient disclosure for purposes of this division that the contract is being entered into in the attorney in fact's representative capacity as attorney in fact.

"(B) An attorney in fact is not personally liable for a debt of the attorney in fact's principal, unless one or more of the following applies:

"(1) The attorney in fact agrees to be personally responsible for the debt.

"(2) The debt was incurred for the support of the principal, and the attorney in fact is liable for that debt because of another legal relationship that gives rise to or results in a duty of support relative to the principal.

"(3) The negligence of the attorney in fact gave rise to or resulted in the debt.

"(4) An act of the attorney in fact that was beyond the attorney in fact's authority gave rise to or resulted in the debt.

"(5) An agreement to assist in the recovery of funds under section 169.13 of the Revised Code was the subject of the power of attorney that gave rise to or resulted in the debt."