JOURNAL ENTRY AND OPINION.
{¶ 1} Defendant-appellant/cross-appellee David E. Bartrum ("Bartrum") and plaintiff-appellee/cross-appellant Regency Centre Development Company, Ltd. ("Regency") appeal/cross-appeal from the judgment and opinion entered by the Cuyahoga County Court of Common Pleas after trial. For the reasons that follow, we affirm the decision of the trial court.
 {¶ 2} The facts adduced at trial establish that Regency entered into two agreements with CDI General Contractors, Construction Dimensions, Inc. ("CDI").[1] The parties stipulated at trial that Regency paid CDI $957,808.26 in connection with the two agreements; paying fully the February 3, 2000 agreement and withholding the sum of $131,652.60 on the remaining agreement. Testimony establishes that Regency withheld the final payment after receiving two applications for payment containing unexecuted Waivers of Lien forms. Regency's General Manager contacted CDI after June 2, 2000 and was advised that CDI was out of business and had no money to pay subcontractors.
 {¶ 3} Thereafter, Regency terminated the agreements by letter dated June 30, 2000, and pursuant to Article 7(f) found in both agreements which provides in pertinent part: "* * * Owner may terminate the Contract by giving fourteen (14) days prior written notice to the General Contractor * * * if the General Contractor fails to perform the Work properly, or fails to make prompt payments to Sub-Contractors or for materials or labor * * *. In such event, Owner may terminate the employment of General Contractor and take possession of all or part of the Contractor's materials, tools, equipment and appliances, and complete the Work by such means as the Owner and General Contractor agree and charge the actual cost (reasonable and without management fees) thereof to the General Contractor, crediting or debiting his account as the case may be when the Work under this General Contractor is fully completed and accepted."
 {¶ 4} The record contains evidence of six mechanics liens filed by various subcontractors on Regency's property. Regency also submitted a worksheet detailing alleged amounts owed to subcontractors unpaid by CDI. CDI disputes at least some of the subcontractors' claims for payment.
 {¶ 5} Months before CDI went out of business, defendant David E. Bartrum, a 50% owner of CDI, determined to retire. Bartrum had served at times relevant as a director and officer of the company. On or around January 31, 2000, Bartrum resigned. It is undisputed that Bartrum deferred his wages for the years 1996 through 1998. While testimony conflicts as to the amount of wages CDI actually owed Mr. Bartrum for this time period, CDI issued payment to Bartrum in the amount of $81,000 on February 2, 2000, through four separate checks: one check for each year of deferred wage (1996-1998), and a fourth check earmarked for federal payroll taxes related thereto.
 {¶ 6} Bartrum testified that prior to taking payment, he first determined that it would not render CDI insolvent. There is evidence that CDI had approximately $300,000 on February 2, 2000. Bartrum's described business partner also testified that he believed the company's assets exceeded its liabilities at that time. Bartrum further testified that he conferred with the company accountant and the office manager prior to taking payment. By May 2000, Bartrum laid off the CDI workforce due to lack of work. By approximately June 2000 CDI was out of business.
 {¶ 7} Initially, CDI classified the $81,000 as wages, but later re-categorized it as a distribution. Consequently, the federal government issued a refund to CDI in the amount of $34,601.01 in September 2000. At that time, Bartrum cashed the refund check made payable to CDI, used $14,068.52 to cover payroll taxes for himself and employees of North Coast Computers, and deposited the balance of $20,532.49 into his own personal account.
 {¶ 8} On July 28, 2000, Regency commenced this action against CDI and Bartrum alleging breach of contract against CDI (Counts I and II), and violations of R.C. 1313.56-58, and R.C. 1336.01-12 against Bartrum (Counts III and IV). The two-day trial commenced on December 4, 2000. Thereafter, Regency filed a motion for default judgment against CDI on December 31, 2001, which Bartrum opposed and the trial court denied. On March 14, 2002, the trial court entered judgment in favor of Regency's claim of fraudulent transfer under R.C. 1336.04(A) as to Bartrum's negotiation of the treasury check issued to CDI in September 2000. In all other respects, the court entered judgment in favor of defendants CDI and Bartrum. Both Bartrum and Regency appeal from this judgment. For ease of discussion, we first address the cross-appeal of Regency and then those errors assigned by Bartrum.
 {¶ 9} "CROSS ASSIGNMENT OF ERROR I. The trial court's judgment in favor of CDI against Regency is not sustained by the manifest weight of the evidence and is contrary to law."
 {¶ 10} The standard of review provides that we may not reverse the trial court's decision as being against the manifest weight of the evidence if we find that the judgment is supported by some competent, credible evidence in the record. C.E. Morris Co. v. Foley ConstructionCo. (1978), 54 Ohio St.2d 279. We are likewise bound, in reviewing a bench trial, to presume that the findings of the trier of fact are correct. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,461 N.E.2d 1273. Regency contends that the evidence establishes that CDI breached the agreements by failing to pay the subcontractors. Regency refers to Articles 2, 4, 7(b) (f) of the agreements in support. The agreements do provide that Regency may terminate the agreements for CDI's failure to pay subcontractors (Article 7(f)) and charge the actual cost to CDI "crediting or debiting [its] account as the case may be."[2] To that end, Regency was entitled to make direct payments to the unpaid subcontractors and to offset those amounts from the balance it owed CDI under the agreement. However, by the time of trial, the evidence established that Regency had $30,924 remaining from the balance it withheld under its agreement with CDI. In other words, Regency established that it paid out over $100,000 to subcontractors unpaid by CDI and that other subcontractors still remained unpaid at that point. It was further established that Regency successfully settled some of the subcontractor's claims for less than the full amount. Yet, in calculating its claimed damages against CDI, Regency assumed the validity of the full amounts allegedly owed to the remaining unpaid subcontractors.
 {¶ 11} A party bringing a cause of action for breach of contract must demonstrate the following: (1) the existence of a binding contract or agreement; (2) that the non-breaching party performed its contractual obligations; (3) that the other party failed to fulfill its contractual obligations without legal excuse; and (4) that the non-breaching party suffered damages as a result of the breach. Garofalo v. Chicago TitleInsurance Co. (1995), 104 Ohio App.3d 95; McIntyre v. Thriftco, Inc. (May 17, 2001), Cuyahoga App. No. 77767.
 {¶ 12} The extent of Regency's claimed damages in this case depend entirely upon the amounts allegedly owed to the remaining unpaid subcontractors. While some subcontractors have filed mechanic's liens on Regency's property, there is no evidence to definitively establish that Regency is obligated to pay the subcontractors and Regency has admittedly not made payments on those amounts. As the trial court noted, there is no evidence that any subcontractor assigned its rights to Regency to collect the amounts allegedly due them from CDI. While the dissent states that the element of damages is not speculative because the subcontractors have filed mechanics liens, Regency itself in its appeal concedes that the only way to resolve the remaining subcontractor claims is through settlement or additional litigation presumably with the relevant subcontractors. The validity of the liens is also not definitively established in this record.
 {¶ 13} Therefore, the extent of Regency's alleged damage as a result of CDI's failure to pay the remaining subcontractor(s) is speculative and, as such, the trial court did not err in entering judgment in favor of CDI on the breach of contract claims. Accord, TextronFinancial Corporation v. Nationwide Mutual Ins. Co. (1996),115 Ohio App.3d 137, 144.
 {¶ 14} We can not agree with the reasons the dissent presents for sustaining this assignment of error. First, the dissent concludes that the trial court erred in denying the motion for leave to amend the complaint to add the subcontractors by interpleader. The dissent reasons that evidence of damages could have been presented at trial if the court had granted Regency's motion for leave to file an amended complaint. That may very well be the case, however, Regency failed to appeal that February 12, 2001 ruling in its notice of cross-appeal and in its brief. Moreover, the denial of a motion for leave to amend a complaint necessitates a review under an abuse of discretion standard.[3] This cross-assignment of error challenges the March 14, 2002 judgment and requires us to review it based upon the manifest weight of the evidence that is in the record. As set forth previously, the evidence in this record is insufficient to establish damages. We can not guess what the record evidence would have been if the court had granted leave to file an amended complaint and we can not address assignments of error that have not been properly raised on appeal. App.R. 12.
 {¶ 15} Alternatively, Regency asserts that the trial court erred in denying its motion for default judgment which it filed several weeks after the close of trial. Rule 55 of the Ohio Rules of Civil Procedure governs the application for entry of default judgment and provides, in pertinent part, "[i]f, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper and shall when applicable accord a right of trial by jury to the parties." Civ.R. 55(A). If the court hears evidence, "it follows that the court should make its decision conform to the law as applicable to the facts proven, and if no cause of action is shown no default judgment in plaintiff's favor should be rendered." Streeton v. Roehm (1948),83 Ohio App. 148.
 {¶ 16} In this instance, Regency failed to move for default judgment prior to trial. The trial court consequently heard the evidence at trial. It was, therefore, incumbent upon the trial court to conform to the law as applicable to the facts adduced at the trial. Ibid. "A trial court's ruling on a motion for default judgment will not be reversed absent an abuse of discretion." Mancino v. Third Federal Savings Loan (Oct. 28, 1999), Cuyahoga App. No. 75063, citing Davis v. ImmediateMed. Serv., Inc. (1997), 80 Ohio St.3d 10. Because the trial court heard the evidence without objection from Regency and therefrom determined that the facts did not support the breach of contract claims against CDI, we do not find that the trial court abused its discretion in denying the motion for default judgment.
 {¶ 17} Cross-Assignment of Error I is overruled.
 {¶ 18} "CROSS ASSIGNMENT OF ERROR II. The trial court's judgment in favor of Bartrum against Regency regarding Bartrum's February 2, 2000 transfer of $81,000.00 from CDI to Bartrum is not sustained by the manifest weight of the evidence and is contrary to law."
 {¶ 19} Regency contends that CDI's February 2, 2000 transfer of $81,000 to Bartrum constituted a fraudulent transfer in violation of R.C. 1336.04(A)(1) and 1336.04(A)(2). Again, Regency maintains that the trial court's finding to the contrary was against the manifest weight of the evidence. Adhering to the requisite standard of review, we must disagree. There is ample, competent and credible evidence to support the trial court's finding that the transfer on February 2, 2000 did not amount to a violation of the referenced statutory provisions.
 {¶ 20} R.C. 1336.04(A) provides that "[a] transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
 {¶ 21} "(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
 {¶ 22} "(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:
 {¶ 23} "(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;
 {¶ 24} "(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."
 {¶ 25} R.C. 1336.04(B) provides a list of factors to aid in ascertaining actual intent under R.C. 1336.04(A)(1).
 {¶ 26} In finding in favor of defendants on this claim, the court found only one "badge of fraud" under R.C. 1336.04(B) persuasive; that being that the transfer was made to Bartrum who was an insider as contemplated in R.C. 1336.04(B)(1).
 {¶ 27} The record provides both competent and credible evidence to support the balance of the trial court's reasoning in reaching its determination. The record supports the trial court's factual findings that Bartrum disclosed the transfer; that CDI had substantial assets at the time of the transfer; that Bartrum arguably provided equivalent value in that he had deferred three years of wage compensation between 1996 and 1998; and that the evidence failed to establish that the transfer was the cause of CDI's insolvency. For these reasons, Cross-Assignment of Error II is overruled.
 {¶ 28} "CROSS ASSIGNMENT OF ERROR III. The trial court erred in failing to grant judgment in favor of Regency against Bartrum for attorney's fees."
 {¶ 29} Regency essentially maintains that because the court found that Bartrum fraudulently transferred assets by negotiating the September 2000 U.S. treasury check made payable to CDI, the court erred in failing to award attorney fees. Regency relies upon the authority of LocafranceU.S. Corp. v. Interstate Distribution Services, Inc. (1983),6 Ohio St.3d 198. While Locafrance holds that "[c]ommon law remedies, including the law of fraud, may be applied when appropriate in fraudulent conveyance cases * * *," it does not sanction an automatic award of attorney fees to those prevailing upon a claim under the statute. In particular, the court found that "`[i]f punitive damages are proper, the aggrieved party may also recover reasonable attorney fees.'" Id. at 202-203, quoting Columbus Finance v. Howard (1975), 42 Ohio St.2d 178.
 {¶ 30} In Locafrance, the plaintiff sought both punitive damages and attorney fees in connection with a fraudulent conveyance claim. In ascertaining whether such damages were warranted, the court examined whether the fraudulent conveyance involved "malicious and intentional conduct" as required for a punitive award. As such, the court went beyond the statutory elements of a fraudulent conveyance claim. Id.; accordAristocrat Lakewood Nursing Home v. Mayne (1999), 133 Ohio App.3d 651,672-673 (finding that the "aggravated mental state of `actual malice' is distinct from the mental state, if any, necessary to establish the underlying fraudulent conveyance." [Citations omitted]).
 {¶ 31} In this case, Regency simply relies upon the finding of a fraudulent conveyance under the statute and does not point to any additional indicia of "actual malice" as related to common-law fraud and required to support an award of common-law remedies beyond those provided for by the statute. Based on the foregoing, we are not persuaded that the trial court erred by not awarding attorney fees under these circumstances.
 {¶ 32} Cross-Assignment of Error III is overruled.
 {¶ 33} We now address Bartrum's appeal assigning two errors for our review.
 {¶ 34} "I. The trial court erred to the prejudice of defendant-appellant David Bartrum in ruling that plaintiff-appellee Regency Centre Development Company, Ltd. had standing as a CDI creditor to assert a fraudulent transfer claim against CDI and Bartrum under Ohio Revised Code Chapter 1336."
 {¶ 35} First, Bartrum argues that Regency was not a "creditor" of CDI under R.C. Chapter 1336 because he contends it owed CDI $131,652.71 under the August 20, 1999 agreement. Under R.C. 1336.01(D), a "`Creditor' means a person who has a claim." In turn, R.C. 1336.01(C) provides that a "`Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." As we have previously found, the agreements provide that Regency may terminate the agreements in the event CDI failed to pay subcontractors and charge the actual cost to CDI "crediting or debiting [its] account as the case may be." There is sufficient competent and credible evidence in the record to support a finding that Regency has a "claim" against CDI due to CDI's failure to pay the subcontractors. Therefore, Regency is a "creditor" of CDI within the meaning of the statute.
 {¶ 36} Assignment of Error I is overruled.
 {¶ 37} "II. The trial court erred to the prejudice of defendant-appellant David E. Bartrum in ruling that his negotiation in September 2000 of a U.S. Treasury check consisting of the federal payroll and income withhold taxes associated with defendant Construction Dimensions, Inc.'s (`CDI') $81,000 gross wage payment to him on February 2, 2000 constituted a fraudulent transfer of an asset of CDI under Ohio Revised Code Chapter 1336."
 {¶ 38} We review this error under the manifest weight standard articulated previously herein. In doing so, we examine whether competent, credible evidence in the record supported the trial court's determination that CDI's September 2000 transfer of $34,601.01 constituted a fraudulent transfer in violation of R.C. 1336.04(A).
 {¶ 39} Bartrum contends that the U.S. Treasury check made payable to CDI was not an "asset" of CDI and thus Bartrum's negotiation thereof did not constitute a fraudulent transfer. An "asset" is defined as "property of a debtor, but does not include any of the following:
 {¶ 40} "(1) Property to the extent that it is encumbered by a valid lien;
 {¶ 41} "(2) Property to the extent it generally is exempt under nonbankruptcy law, including, but not limited, section 2329.66 of the Revised Code;
 {¶ 42} "(3) An interest in property held in the form of a tenancy by the entireties created under section 5302.17 of the Revised Code prior to April 4, 1985, to the extent it is not subject to process by a creditor holding a claim against only one tenant."
 {¶ 43} A "transfer" is defined as "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." R.C. 1336.01(L).
 {¶ 44} Bartrum argues that because the amount of the treasury check is allegedly traceable to the amount of federal payroll and income withholding taxes associated with his February 2, 2000 payment, it belongs to him and/or the government and not CDI. Had the distribution remained classified as wages and had the government kept possession of the money as taxes, we would be inclined to agree. This, however, is not the case.
 {¶ 45} The government refunded the money to CDI because the $81,000 payment was reported as a distribution purportedly for the very purpose of having the money returned to CDI's possession.[4] The contention that certain provisions of the Internal Revenue Code impressed a trust on that money as the exclusive property of the U.S. Government glosses over the fact that it was the U.S. Government that returned the money to CDI. Once the February 2000 payment was categorized as a distribution, the refunded money was returned to the possession of CDI, thus qualifying the funds as an "asset" of CDI within the statutory definition.
 {¶ 46} Next, Bartrum contends that the evidence does not support a finding that the check was negotiated with actual intent to hinder, delay, or defraud any creditor of CDI. The trial court, however, found several of the "badges of fraud" present in reasoning as follows: "CDI, while Bartrum was still an officer or director, was shut down in May 2000. It is without question that in September 2000, Bartrum's transfer constituted substantially all of CDI's assets. The September transfer was also concealed. It was established at trial that Bartrum himself cashed the check and placed over Twenty Thousand Dollars ($20,000) into his own account, at all times controlling said funds. Trial testimony established that neither CDI's outside accountant nor Michael Marron, former general manager and president of CDI, knew of the transfer." 74, Vol. 2716, Pg. 117). The record evidence supports these findings.
 {¶ 47} Lastly, Bartrum contends that CDI received equivalent value in exchange for the money and that the negotiation of the check did not render CDI insolvent or unable to conduct its business. We find Bartrum's contentions insufficient to rebut the presumption that the findings of the trial court were correct. Ibid. The financial condition of CDI in September 2000 differed significantly from its state in February 2000 when Bartrum took the initial payment. Connecting the payment to the initial distribution does not shelter the funds from the reach of CDI's creditors. By September 2000, CDI was without any active employees, out of business, insolvent, and unable to pay its debts. The evidence further supports the trial court's observation that "the September transfer occurred shortly after substantial debt was incurred; specifically, the arbitration award and judgment against CDI by Stella Moga was over Two Hundred Nineteen Thousand Dollars ($219,000.)" To that end, we find that the record contains both competent and credible evidence in support of the trial court's finding that a fraudulent transfer occurred with respect to the endorsement of the U.S. treasury check from CDI to Bartrum in September 2000.
 {¶ 48} Assignment of Error II is overruled.
Judgment affirmed; cross-appeal denied.
ANN DYKE, P.J., CONCURS. DIANE KARPINSKI, J., CONCURS IN PART ANDDISSENTS IN PART.
[1] Agreement Between Owner and General Contractor dated February 3, 2000 referred to at trial as the "PMC contract"; and Agreement Between Owner and General Contractor dated August 20, 1999.
[2] We do not agree with Bartrum's reading of Article 7(f) in that we do not find, as he contends, that Regency's right to terminate only arises if CDI substantially failed to complete the jobs. In actuality, that is only one of several events that give rise to Regency's right to terminate as evidenced by the use of the disjunctive "or" throughout that provision. We find that the terms of Article 7(f) independently provide a right to terminate for CDI's failure to pay subcontractors. Ibid.
[3] In reviewing a trial court's denial of a motion to amend a complaint "[t]his court's role is to determine whether the trial judge's decision was an abuse of discretion, not whether it was the same decision we might have made." Lalak v. Crestmont Constr. Inc. (Jan. 14, 1998), Cuyahoga App. No. 72567, citing State, ex rel. Wargo v. Price (1978),56 Ohio St.2d 65.
[4] While Bartrum relies upon the Internal Revenue Code and federal law, including Candy's Tortilla Factory, Inc. v. United States ofAmerica (D. Col. 1997), 1997 U.S. LEXIS 15669, none of the authority cited is analogous with this case which involves the classification of a payment as a distribution.