**In re Thomas L. KIRKPATRICK and Mary S. Kirkpatrick, Debtors.**

**Michael V. Demcyzk, Trustee, Plaintiff,**

**v.**

**Lesh, Casner & Miller, L.P.A., Defendant.**

**No. 98–63731.**

United States District Court, N.D. Ohio, Eastern Division.

Sept. 28, 2000.

**380**

Jack R. Baker, Baker, Dublikar, Beck, Wiley & Mathews, North Canton, OH, for Lesh, Casner & Miller.

Roger J Stevenson, Roetzel & Andress, Akron, OH, for Michael V. Demcyzk, trustee.

## OPINION

GWIN, District Judge.

On September 25, 2000, this case came before the Court for jury trial. At the conclusion of Plaintiff–Trustee Demcyzk's case, Defendant Lesh, Casner & Miller, L.P.A. ("Lesh, Casner & Miller") moved this Court for judgment as a matter of law, pursuant to Rule 50 of the Federal Rules of Civil Procedure. Finding no evidence on which a jury could properly proceed to find a verdict for the plaintiff, the Court grants the motion.[1]

## I.

In this action, Plaintiff–Trustee Michael Demcyzk asserts two claims against Defendant Lesh, Casner & Miller on behalf of Debtors Thomas and Mary Sue Kirkpatricks' bankruptcy estate. First, the plaintiff seeks to recover certain funds the Kirkpatricks allegedly fraudulently transferred to the defendant in partial restitution of the approximately $150,000 their daughter stole from the defendant while in its employ. Second, the plaintiff seeks to recover compensatory and punitive damages for the defendant's alleged fraud and deceit in inducing the Kirkpatricks to make restitution on behalf of their daughter.

The embezzlement at the core of this action was committed by Kelly Creighton, Mary Sue Kirkpatrick's daughter from a previous marriage. Creighton served as a bookkeeper with Defendant Lesh, Casner & Miller from 1993 to 1996. On or about March 6, 1996, the defendant discovered that Creighton had stolen approximately $150,000 from the firm, including more than $20,000 of client funds held in trust accounts.[2] Upon this discovery, the defendant immediately fired Creighton.

After being fired, Kelly Creighton went to the Kirkpatricks' home to meet with her mother. At this meeting, Kelly Creighton acknowledged stealing Defendant Lesh, Casner & Miller's funds. Kelly Creighton said she feared going to jail. Mary Sue Kirkpatrick, a former deputy sheriff, also believed her daughter might go to jail.

Almost immediately after being fired, Kelly Creighton hired attorney C. Stephen Ayers to represent her. Attorney Ayers quickly contacted Defendant Lesh, Casner & Miller to try to stop criminal prosecution of his client. In contacting the defendant on Kelly Creighton's behalf, Attorney Ayers indicated that the Kirkpatricks were willing to contribute to the restitution of the funds Creighton had stolen. However, as he explained in a March 7, 1996, letter faxed to the defendant, Attorney Ayers had advised the Kirkpatricks that any fur-

---

**1.** After Defendant Lesh, Casner & Miller moved for judgment the Court heard arguments and set out, in summary form, its reasons for granting the motion for directed verdict. This memorandum supplements the Court's oral findings.

**2.** Attorney Lombardi, the Lesh, Casner & Miller partner in charge of employees, testified:
THE COURT: I'm curious, and it has some relevance. Where do you think the money went that you—that supports the opinion that she didn't have the 150 in some account that you could respond to it?
A. Well, we knew that—we knew that she spent some of it on an automobile, because there was a check made to a car dealership for 8,000 bucks out of our trust account. I remember that specifically. Somehow there was testimony, or we got some information that she spent some of it on her friend for cosmetic things. We had no—we didn't know whether that was correct or not, but that's what we heard. Hair-'dos and breast implants is what we were told. Other than that, I think there was a computer. Other than that, we had no idea where the money might have went. She went to Las Vegas twice. Other than that, we had no knowledge of what her assets were, where that money might have been.

ther discussion regarding restitution would have to wait until the defendant computed the total amount of embezzled funds:

"Please be advised that I have been retained by the above-captioned individual [Kelly Creighton] with respect to alleged activity while in your employment. *I have advised Kelly, her mother and step-father* of the fact that there is nothing to discuss with you at this time relating to restitution since you do not have a final figure." (Emphasis added.)

On March 11, 1996, Attorney Ayers spoke with Jake Hess, the president of Defendant Lesh, Casner & Miller. Hess's contemporaneous notes indicate that Attorney Ayers organized a meeting between the defendant and the Kirkpatricks to discuss restitution:

"Family wants to pay it all back. I [Hess] said, in spite of what Kelley may have told him, we [Lesh, Casner & Miller] have determined its into 6 figures. W/o complete audit, but we have sufficient checks to show [undecipherable]. Family will turn over entire PI. Steve [Ayers] only wants assurance we won't prosecute. Meeting Tues. p.m. 7:00. Steve will check with family.... Steve suggests meeting at his place—family will be more relaxed than here ..."

These notes reveal that the defendant neither requested the Kirkpatricks' participation in a restitution plan nor set up the meeting to discuss restitution. Attorney Ayers took the lead in presenting to the defendant the Kirkpatricks' desire to help their daughter.

On the evening of March 12, 1996, Defendant Lesh, Casner and Miller partners Jake Hess, Dennis Fox and Thomas Lombardi met at Ayers's office with Attorney Ayers, Kelly Creighton, and the Kirkpatricks. Hess attended as the defendant's president. Lombardi served as the defendant's vice-president, which gave him responsibility for the firm's personnel. Fox,

a certified public accountant as well as an attorney, supervised the effort to reconstruct the amount of loss caused by Kelly Creighton's theft.

At this meeting, the Kirkpatricks and Kelly Creighton arrived and spoke with Attorney Ayers before the representatives of Defendant Lesh, Casner & Miller arrived. Upon their arrival, Hess, Fox and Lombardi met with Creighton, the Kirkpatricks and Attorney Ayers and distributed documentation of what monies they believed Kelly Creighton had stolen.

After receiving this, the Kirkpatricks and Kelly Creighton left the room to confer separately with Attorney Ayers. Ayers then shuttled between the room occupied by Creighton and the Kirkpatricks and the room occupied by Hess, Fox, and Lombardi. During these discussions, the representatives of Defendant Lesh, Casner & Miller had no contact with the Kirkpatricks.

Although Attorney Ayers is subject to the subpoena power of this Court, Plaintiff Demcyzk never offered his testimony concerning the discussions he held with the Kirkpatricks, Kelly Creighton and Defendant Lesh, Casner & Miller.[3] However, Attorney Lombardi's testimony suggests that Attorney Ayers proposed the total amount the Kirkpatricks and Creighton could pay in restitution:

Q How was it decided that $75,000 is what Tom and Sue would be able to pay?

A That would have come from Steve Ayers, after his discussions with Tom and Sue and Kelley.

Q It didn't come from you?

A No.

Q And there wasn't any negotiations back and forth about what that number was going to be?

---

**3.** The Defendant Lesh, Casner & Miller had identified attorney Ayers as a witness they

would call in their case.

A  By back and forth—we talked to Steve Ayers is the only person we talked to.

\* \* \*

THE COURT: Let me just ask—did they start off with 75, and you start off higher, they start off lower.

A  I can't recall. What happened was, I'm telling you we went there, we knew we were out about $150,000. At some point in the discussions, we said—they said $115,000, we said, fine. And the rest of the conversations were between Steve Ayers and the Kirkpatricks, figuring out how they—how they could, between the three of them, pay $115,000. This is what they came up with then as far as the—as far as Tom and Sue were going to pay 75 and Kelley would pay the rest of it.

Q  So you're saying there weren't negotiations back and forth?

A  There was a lot of discussion back and forth, but I don't know where the figure 40 and 35 and 75 came down. We made no demands on the Kirkpatricks at all.

Q  You made no demands on them?

A  None.

By the conclusion of the meeting, Kelly Creighton had agreed to pay $40,000 to Defendant Lesh, Casner & Miller. The Kirkpatricks agreed to pay $75,000 toward Creighton's indebtedness. The Kirkpatricks and Creighton executed notes reflecting these obligations.

The Kirkpatricks also executed a mortgage and collateral assignment to secure their promissory note. Under the mortgage, the Kirkpatricks created a lien for $35,000, payable upon the sale of the home, the sale to be completed on or before February 1, 1997. The Kirkpatricks also agreed to pay for part of the note from proceeds of their respective personal injury claims arising from 1994 accident, for which Attorney Lombardi was already providing them representation.

On May 24, 1996, the Kirkpatricks sold their home, distributing $35,000 of the equity proceeds to Defendant Lesh, Casner & Miller in satisfaction of the previously executed mortgage. They sold their home in May 1996 even though the note did not require them to redeem the mortgage until February 1997. And although they had sufficient equity to finance the $35,000 obligated under the mortgage, the Kirkpatricks never inquired into receiving a home equity loan. Indeed, Thomas Kirkpatrick explicitly rejected any such notion.[4]

On March 26, 1997, Mary Sue Kirkpatrick settled her personal injury claim for $18,000. On May 6, 1997, Thomas Kirkpatrick settled his personal injury claim for $57,650. From these settlements, the Kirkpatricks paid the $40,000 balance of their $75,000 agreement on behalf of Kelly Creighton.

On November 13, 1998, the Kirkpatricks filed their voluntary petition for relief under Chapter 7 of Title 11 of the United States Code. Soon thereafter, the bankruptcy court appointed Plaintiff Demcyzk to serve as trustee of the Kirkpatricks' bankruptcy estate.

Plaintiff Demcyzk now seeks to recover under Ohio's Uniform Fraudulent Transfer Act the $75,000 the Kirkpatricks transferred to Defendant Lesh, Casner & Miller. Although the transfer of these funds occurred nearly two years before the Kirkpatricks filed their bankruptcy petition, Demcyzk says the Kirkpatricks should have known that the transfer would render them unable to pay their debts as they became due.

Further, Plaintiff Demcyzk says Defendant Lesh, Casner & Miller fraudulently induced the Kirkpatricks into making restitution payments on behalf of Kelly

4.  Mary Sue Kirkpatrick testified that her husband dismissed the idea of getting a home equity loan and having Kelly Creighton make the monthly payments.

Creighton. According to the plaintiff, the defendant had decided before the March 12, 1996, meeting not to report Creighton's embezzlement to the local criminal prosecutor. But the plaintiff says the defendant allowed the Kirkpatricks to believe their restitution payments would save Creighton from prosecution. The defendant's failure to disclose its decision not to prosecute, according to the plaintiff, constitutes fraud.

## II.

Defendant Lesh, Casner & Miller moves this Court for judgment under Rule 50 of the Federal Rules of Civil Procedure. Rule 50 sets forth the standard for granting judgment as a matter of law:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law.

■ In applying this standard, the Court is not to weigh the evidence or judge the credibility of witnesses. *See Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 798 (6th Cir.1998). Instead, the Court, after making all reasonable inferences in favor of the nonmoving party, will grant judgment only if "a reasonable juror, relying on the evidence put forth at trial, could not find for the plaintiff on each of the elements of her claim." *Id.* (citing *Monday v. Oullette*, 118 F.3d 1099, 1101–02 (6th Cir.1997)).

■ Federal courts do not follow the rule that a scintilla of evidence is enough to create an issue for the jury. *See Wilkins v. Eaton Corp.*, 790 F.2d 515, 522 (6th Cir.1986) ("For a case to be properly submitted to the jury, there must be more than a scintilla of evidence supporting the claim.") (internal quotations omitted). The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury properly could find a verdict for that party:

> The test for directed verdict motion is the same as summary judgment motion: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. . . . If the defendant . . . moves for . . . a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotations omitted).

Applying these standards, the Court considers Defendant Lesh, Casner & Miller's motion.

## III.

### A.

■ In Count I of his complaint, Plaintiff Demcyzk seeks to recover the funds received by Defendant Lesh, Casner & Miller on account of the Kirkpatricks' transfer of the $75,000 promissory note, mortgage, and personal injury claims. The plaintiff says these transfers are voidable under Ohio Revised Code Sections § 1336.04(A)(2), which provides in pertinent part:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

\* \* \*

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

\* \* \*

(b) The debtor *intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.*

*Id.* (emphasis added).[5]

This claim fails because Plaintiff Demcyzk has not presented any plausible evidence suggesting that the Kirkpatricks believed or reasonably should have believed that, in the wake of these transfers, they would be unable to pay their debts as they became due.

First, the Kirkpatricks testified that they have paid their debts as they became due both before and after filing their bankruptcy petition. Thomas Kirkpatrick explained that he and his wife paid their debts after selling their home and assigning their personal injury claims:

Q Your wife has testified, and I believe will testify here, that you paid your bills regularly and on time up until the time you filed the bankruptcy petition in November of 1998. Is that accurate as far as you know?

A That's—that's true, yes, sir.

Q So we can assume, because it is true, as you say, that you and your wife paid your bills when due up until you filed the bankruptcy petition in November of 1998?

A Yes, sir.

Mary Sue Kirkpatrick testified to like effect:

Q Did you have good credit back in 1994?

A I had good credit till the day I filed bankruptcy, right to the day, right to the penny.

Q Did you pay all of your bills as they came due regularly up until the time you filed the petition in bankruptcy in November of 1998?

A I sure did.

Q And was your credit good up until the time you filed your petition in bankruptcy?

A Yes, sir.

Second, the circumstantial evidence, when reasonably considered, shows that the Kirkpatricks were able to meet their ongoing obligations. They continued to purchase non-essentials for more than two years. For example, Thomas Kirkpatrick purchased a motor scooter on credit less than a week after executing the March 12, 1996, promissory note:

Q Sure. Now, that was March 12th when you signed these documents. After that, within the week or so after these March transactions, did you purchase anything, any large items?

A I could have. I don't know.

Q Well, did anybody in your household purchase a motorcycle?

A As a matter of fact, I did. I bought me a motor scooter, sure did.

Q On March 18th?

---

5. Originally, Plaintiff Demcyzk made a claim arising in professional negligence. He later dismissed this claim.

Plaintiff Demcyzk also had made a separate claim that the transfers were avoidable under Ohio Revised Code Sections 1336.05(A) because the transfers were made without the Kirkpatricks having received reasonably equivalent value in exchange and at times when the Kirkpatricks were insolvent or were rendered insolvent as a result. Prior to trial, Trustee Demcyzk dismissed this claim

A  Yes, sir.

Q  And you bought it at Harding's Hart cycle in Canton?

A  Yes, sir, I did.

Q  And you paid $1,885 for it.

A  Yes, sir, that was with tax.

Q  That was a week after you signed these documents?

A  Yes, sir, it was.

Q  And why did you buy a motorcycle for $1800–some–dollars a week after you signed these notes?

A  Because I felt bad that I had always wanted one, and I was never going to get one unless I got it, and I went out and I bought it.

And in the months before filing the bankruptcy petition, Mary Sue Kirkpatrick spent over $2,000 on jewelry from the QVC home shopping network: $544 in February 1998; $153 in March 1998; $535 in April 1998; $231 in May 1998; $170 in June 1998; $321 in July 1998; and $546 in August 1998.

Finally, the evidence before the Court suggests the Kirkpatricks had more than enough income to meet their debts as they became due. Thomas Kirkpatrick works as a furniture salesman and earns approximately $25,000 per year.[6] Mary Sue Kirkpatrick is disabled and receives over $16,000 per year in disability benefits.[7] As a disabled public employee, Mary Sue Kirkpatrick also receives state-paid health insurance. Together, the Kirkpatricks earn approximately $40,000 per year.

At trial, Plaintiff Demcyzk showed almost no ongoing expenses that prevented the Kirkpatricks from satisfying their debts. The Kirkpatricks have fully paid for the current residence, although they testified that they pay lot rental of $240 per month. They receive health insurance. They have no children living with them and no education expenses. While they stated they had automobile payments of close to $600, their petition in bankruptcy shows only one automobile lease payment of $290.04 per month, and Mary Sue Kirkpatrick testified she had her convertible automobile for many years. Their bankruptcy petition shows only $1,410 in monthly expenses. Even allowing for the Kirkpatricks' unproven automobile expenses, the Kirkpatricks had $700 more income than expenses each month.

Thus, the evidence in this case overwhelming demonstrates that the Kirkpatricks could meet their debt obligations as they became due.[8] Accordingly, Plaintiff Demcyzk cannot prevail on his claim under § 1336.04(A)(2).

■ Arguing otherwise, Plaintiff Demcyzk insists the Court should interpret § 1336.04(A)(2) as authorizing the recovery of any transfer that a debtor should have known would cause his debts to increase beyond his assets. But the plain language of § 1336.04(A)(2) precludes such an interpretation. The phrase "debts be-

---

6. Thomas Kirkpatrick had income in 1994 of $26,135; income in 1995 of $25,843, income in 1996 of $24,308; income in 1997 of $27,103 and income in 1998 of $27,786.

7. Mrs. Kirkpatrick suffers from cardiac problems, a permanent back injury and depression.

8. At trial, Plaintiff Demcyzk offered his own opinion as to whether the Kirkpatricks should have reasonably believed they would incur debts beyond their ability to pay as they became due. The plaintiff argued that he was permitted to give such testimony as an expert on bankruptcy and financial matters.

The Court found the plaintiff's opinion testimony inadmissible under Rule 702 of the Federal Rules of Evidence. The Court ruled that the plaintiff did not possess any expertise that would assist the trier of fact in deciding what the Kirkpatricks or any other debtors reasonably should believe about their financial state.

Even if the Court had allowed this testimony, Plaintiff Demcyzk's opinion as to whether the Kirkpatricks should have known they would be unable to pay their debts does not establish that the Kirkpatricks were in fact unable to pay their debts. Indeed, the Kirkpatricks' testimony makes clear that they met their monthly debt obligations.

yond his ability to pay as they became due" simply does not mean "debts beyond his total amount of assets." Indeed, an Ohio appellate court recently noted this distinction:

> There are two basic definitions of insolvency. The balance sheet approach determines whether assets exceed liabilities, whereas the equitable test looks at cash flow and whether the debtor has an ability to pay debts as they become due.

*Aristocrat Lakewood Nursing Home v. Mayne,* 133 Ohio App.3d 651, 664 n. 11, 729 N.E.2d 768, 777 (1999).

Thus, whether the Kirkpatricks piled up debts beyond their assets is of no moment in an action under § 1336.04(A)(2). Nor does it matter that the Kirkpatricks could not have immediately paid their debts. The language in § 1336.04(A)(2) refers to a debtor's ability to his pay debts "as they became due," not an ability to immediately pay his debts in full.

For all of these reasons, the Court finds that no reasonable juror could find that the Kirkpatricks had debts beyond their ability to pay as they became due at any point either before or after transferring funds to Defendant Lesh, Casner & Miller. Accordingly, the Court gives Defendant Lesh, Casner & Miller judgment as to Count I of Plaintiff Demczyk's claim.

### B

■ In Count III of the complaint, Plaintiff Demcyzk makes a common-law fraud claim against Defendant Lesh, Casner & Miller. With this claim, the plaintiff says the defendant had reached a decision to never solicit prosecution of Kelly Creighton, had an obligation to disclose this decision, and failed to do so. The Court finds no reasonable juror could find for the plaintiff on this claim.

■ Under Ohio law, Defendant Lesh, Casner & Miller had a duty to disclose any decision not to seek prosecution of Kelly Creighton only if some type of special relationship existed between the defendant and the Kirkpatricks:

> The duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them. The term 'fiduciary relationship' has been defined as a relationship in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.

*Steinfels v. Ohio Dept. of Commerce,* 129 Ohio App.3d 800, 807, 719 N.E.2d 76, 82 (1998).

■ Moreover, even if the Kirkpatricks imposed trust or confidence in Defendant Lesh, Casner & Miller, a duty to disclose did not necessarily arise. A special or fiduciary relationship exists only if both parties recognize the existence of such a relationship. A unilateral imposition of trust or confidence does not create a special relationship of trust:

> The assertion that one party reposed a 'special trust' in the other party 'is insufficient as a matter of law without the allegation that both parties understood that this fiduciary relationship existed.'

*Nichols v. Chicago Title Ins. Co.,* 107 Ohio App.3d 684, 698, 669 N.E.2d 323, 333 (1995) (quoting *Lee v. Cuyahoga Cty. Court of Common Pleas,* 76 Ohio App.3d 620, 623, 602 N.E.2d 761, 763 (1991)); *Mancini v. Gorick,* 41 Ohio App.3d 373, 374–75, 536 N.E.2d 8, 10 (1987) (stating that a duty to disclose "may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence") (internal quotations omitted); *see also Craggett v. Adell Ins. Agency,* 92 Ohio App.3d 443, 451, 635 N.E.2d 1326, 1331–32 (1993) (explaining that a special relationship of trust and confidence "cannot be unilateral," but "may arise from an informal relationship only if both parties

understand that a special trust or confidence has been reposed").

Here, the evidence belies any claim that the Kirkpatricks reposed trust or confidence in the fidelity or integrity of Defendant Lesh, Casner & Miller with regard to the restitution negotiations. The Kirkpatricks knew their interests were aligned with their daughter, not with the defendant. And the manner of negotiations shows the Kirkpatricks were not relying on the defendant's candor in resolving the matter. The parties negotiated back and forth from different rooms, with Attorney Ayers, who had called the meeting on behalf of the Kirkpatricks, acting as the primary negotiating agent for Creighton and the Kirkpatricks.

For these same reasons, Defendant Lesh, Casner & Miller had no reason to believe the Kirkpatricks were somehow relying on its integrity and fidelity. Attorney Steve Ayers contacted the defendant and invited partners therefrom to negotiate a resolution to this matter with Kelly Creighton and her parents. The defendant went to Steve Ayers's office and engaged in negotiations, with Ayers apparently advising the Kirkpatricks throughout.

■ Plaintiff Demcyzk seeks to avoid the shortcomings of his case by relying on the attorney-client relationship between the Kirkpatricks and Defendant Lesh, Casner & Miller with regard to the Kirkpatricks' personal injury suit. But an attorney-client relationship with regard to one particular matter does not create a fiduciary duty of trust and confidence in all contexts, particularly where the parties' interests are clearly adverse.

Indeed, Mary Sue Kirkpatrick acknowledged that she understood Defendant Lesh, Casner & Miller was not acting as her attorney during the restitution negotiations:

Q—but would it be a fair statement that nobody at Lesh, Casner & Miller, including Mr. Lombardi, represented you with respect to any of these matters? Would that be a fair statement? The only thing they represented you on was the personal injury.

A Exactly.

Plaintiff Demcyzk thus fails to show evidence upon which any reasonable juror could find that the Kirkpatricks had reposed any trust or confidence in Defendant Lesh, Casner & Miller with regard the Kirkpatricks's efforts to keep her daughter out of jail. The plaintiff also fails to show evidence upon which any reasonable juror could find that the defendant believed the Kirkpatricks had reposed any such trust.

■ Even if he had offered any credible evidence supporting Defendant Lesh, Casner & Miller's duty to disclose, Plaintiff Demcyzk also fails to show that any decision had been made with regard to whether the defendant would seek Creighton's prosecution. In support of his claim that the defendant had decided not to prosecute, the plaintiff relies solely on the deposition of Attorney Lombardi. But Lombardi's testimony both at trial and during his deposition does not support the plaintiff's contention.

At trial, Attorney Lombardi testified that Defendant Lesh, Casner & Miller had not made a final decision about whether to seek Creighton's prosecution:

Q Isn't it fair to say that you reached a consensus at that meeting that regardless of whether you'd be able to collect anything from Kelley Creighton or from the Kirkpatricks, for that matter, that you had reached a general consensus that you would not report Kelley Creighton's actions to the prosecutor for your own independent reasons?

A At that meeting where we—the decision that we made was not to—yes, we will go to the meeting with Steve Ayers, and we will not report it to the prosecutor. That was our general consensus. And in that respect, we'll

go and see what Steve Ayers has to say. We didn't know what would be offered at that time. We didn't know if they with going to offer $5,000, $10,000, whatever. We had no idea.

So we thought we would go, we would listen to Steve, and then we would make a decision if a decision hadn't been made after that.

Seeking to rebut this, Plaintiff Demcyzk examined Attorney Lombardi regarding testimony he gave at his deposition. At that deposition, Attorney Lombardi testified:

Q. Okay, so you made a decision that Kelley Creighton's actions weren't going to be reported to the prosecutor. That's fair?

A. Yes.

At trial, Attorney Lombardi testified explained this deposition testimony:

Q Is there any aspect to that testimony that I've stated inaccurately?

A No, but it's exactly what I was just saying to you, that all of that is in context of whether or not we were going to go to the meeting at Steve Ayers' office or not or just report her to the prosecutor. We made the decision to go to the meeting, so that's a perfectly correct statement. We had decided not to go to the prosecutor at that time. Had things not worked out well at Steve Ayers office, then we were going to decide whether to go to the prosecutor.

Q But you also decided that you were not going to go to the prosecutor even if we didn't get the money back, because it would mean more harm to you to have it published. That was the general consensus in the meeting?

A Yeah, and later on in that same deposition, when it was asked of me again, what would we have done if all she had offered the 401K plan, and I said we hadn't made a decision about that, and we hadn't. Because

that part of the deposition I was talking about when we had our meeting, we were talking about whether to go to Steve Ayers' meeting or not, or just report her to the prosecutor.

The testimony relied upon does not give sufficient support for Plaintiff Demcyzk's argument that Defendant Lesh, Casner & Miller reached a decision not to seek prosecution of Kelly Creighton. First, there is no formal action taken on behalf of the professional corporation disclaiming its right to seek criminal prosecution. Second, while Attorney Lombardi is an officer of the defendant, he does not speak for the corporation and he has no personal knowledge of whether other members would decline seeking criminal prosecution. Rex Miller, who now serves as president of the defendant, testified: "that some of the other fellows in the firm were interested in prosecuting her. Some of us were interested in getting the money paid back to the firm, so that we could take care of our obligations, and we did have some conflict among the five of us."

Thus, even if there were some duty to disclose, the Court finds no reasonable jury could find that Defendant Lesh, Casner & Miller had reached any firm conclusion whether to seek prosecution.

For these reasons, the Court finds no reasonable juror could find in Plaintiff Demcyzk's favor with regard Count III of the Complaint.

## IV.

After construing all of the evidence in a light most favorable to Plaintiff Demcyzk, the Court finds that a fair-minded jury could not return a verdict against Defendant Lesh, Casner & Miller on either of the plaintiff's claims. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Accordingly, the Court grants the defendant's motion for judgment as a matter of law under

Rule 50 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.