**CB RICHARD ELLIS, INC., a Delaware corporation, Petitioner–Appellant,**

v.

**CLGP, LLC, Respondent–Appellee,**

and

**Robert Hatch, Esq., and Gesco Corporation, Garnishees–Appellees.**

**No. 09CA1368.**

Colorado Court of Appeals, Div. VII.

July 22, 2010.

Rehearing Denied Sept. 30, 2010.

Silver & DeBoskey, P.C., Joe L. Silver, Martin D. Beier, Ruba M. Forno, Denver, Colorado, for Petitioner–Appellant.

Waas Campbell Rivera, LLP, Darrell G. Waas, Patricia C. Campbell, Denver, Colorado, for Respondent–Appellee and Garnishees–Appellees.

Opinion by Judge BERNARD.

In this garnishment action, judgment creditor and garnishor, CB Richard Ellis, Inc., a real estate brokerage company (the broker), appeals from the trial court's order denying its traverse of answers to garnishment filed by the garnishees. They are Robert Hatch, Esq., and the Gesco Corporation, who are the only owners of the judgment debtor, CLGP, LLC (the LLC). We affirm.

## I. Factual Background

The LLC is a limited liability company that was formed in Colorado in 2003 for the sole purpose of purchasing, and later selling, 2.75 acres of land (the property) in Douglas County, near the Park Meadows Shopping Mall. The LLC has two members.

The first is the Gesco Corporation, one of the garnishees. It is owned by a real estate manager, Gerald Student. Gesco has a two-thirds ownership interest in the LLC.

The second member is Richard Hatch, the other garnishee. He is a real estate attorney who specializes in real estate lending. He has a one-third ownership interest in the LLC.

The LLC bought the property in 2004 for about one million dollars. Then the LLC entered into a listing agreement with the broker to sell the property. The LLC picked the broker largely because Student had a close friendship with Timothy Swan, one of the broker's agents, who became the listing broker for the property. The only parties to the listing agreement were the LLC and the broker.

As pertinent here, the listing agreement provided that the broker would earn a 6% commission if specified conditions were satisfied. Further, the broker would conduct all negotiations for the property's sale. The broker and the LLC would resolve all disputes through binding arbitration. If the LLC wrongfully refused to pay the broker's commission, the broker would be entitled to the commission, plus 12% interest per year on the amount of the commission that had not been paid. Finally, the prevailing party in any arbitration proceeding would be entitled to recover its expenses and attorney fees.

For twenty-six months, beginning in March 2004, the broker tried to sell the property, and the parties twice extended the agreement's time period. However, in May or June 2006, before the time period expired, Student told Swan that he was taking over responsibility for negotiations with Grand Peaks, a potential buyer. In late June, Hatch, acting on the LLC's behalf, told the broker that, because Student's efforts might culminate in the property being sold, the broker's commission would be cut in half.

The broker objected. In September 2006, it sent a letter to the garnishees and to the title company that would be responsible for processing the property's sale. The letter stated that the broker's commission should be paid out of the sale proceeds if the property sold. In November 2006, the broker sent a letter to Hatch, which stated that any failure to pay the full 6% commission if the property sold within the listing agreement's time period would violate the agreement.

In January 2007, Grand Peaks entered into a contract with the LLC to buy the property. The sale closed in April 2007. Despite the broker's claim, all the sale's net proceeds, close to two million dollars, were distributed directly to the garnishees, proportionately to their ownership interest in the LLC. Using the 6% sales commission figure, the sale would have generated a commission of about $177,000.

The garnishees recognized at the time of the sale that the LLC could be liable to the broker for the disputed real estate commission. So, at the time of the distribution, the garnishees created a $200,000 asset, owned by the LLC, which took the form of a reserve based upon the garnishees' personal guarantees. This reserve was created by the garnishees' personal promises to return up to $200,000 to the LLC when, and if, the LLC had to pay the disputed real estate commis-

sion. The garnishees had several reasons for setting the asset's value at $200,000.

First, it was larger than $177,000, the full amount of the disputed sales commission.

Second, the garnishees later stated that they believed that the LLC did not owe a commission to the broker. This belief was based, in part, on an affidavit from one of the buyer's representatives that stated that the broker did not negotiate with the buyer concerning the property.

Third, the garnishees believed that any commission owed would be less than $177,000 because they thought that the broker would settle the dispute for a smaller figure. Student had a close personal relationship with Swan, which the garnishees believed would result in an agreement short of litigation. And, before the closing on the property's sale, Swan told Student that he would forego his portion of the commission, or $88,500, if the garnishees would pay the remainder. Last, as an experienced real estate attorney, Hatch thought that such disputes almost always settled for less than the full amount of the commission because the parties often know that they will work together on future deals.

The dispute did not settle. In 2007 and 2008, the parties unsuccessfully attempted to mediate it. The mediation included Student's offer, which was rejected, to settle for $88,500. Up to this point, Student still believed that the dispute would settle.

The next step was arbitration in July 2008. The broker claimed its full commission of $177,000, plus attorney fees and interest under the listing agreement. The LLC hired outside counsel to litigate the arbitration, and paid counsel's fees out of the $200,000 reserve asset.

The arbitrator issued the final award in September 2008. As pertinent here, the arbitrator decided that the broker and the buyer had negotiated over the property, so the broker was entitled to the full 6% commission. Further, the broker was entitled, under the listing agreement, to 12% annual interest on its commission, and, as the prevailing party, to recover its attorney fees and costs. The total of the arbitrator's award

was $395,000. In December 2008, the district court confirmed this amount, and ordered the LLC to pay it to the broker.

The broker then garnished the LLC's asset. By this point, all that remained was $44,500. The broker then garnished the garnishees. The garnishees answered, denying that they owed anything.

The broker filed a traverse of the garnishees' answer. As pertinent to this appeal, the broker argued that the distributions from the sale of the property to the garnishees were constructively fraudulent transfers under sections 38–8–105(1)(b)(I), (II), and –106(1), C.R.S.2009, of the Colorado Uniform Fraudulent Transfer Act (CUFTA).

The trial court held a hearing on the broker's traverse in May 2009. The court, again as pertinent here, concluded that (1) the transfer was not constructively fraudulent under section 38–8–105(1)(b)(I) or (II) of CUFTA; and (2) although the form of the LLC's reserve asset was unusual, it did not violate CUFTA. The trial court's orders did not explicitly address the broker's argument that the distribution was constructively fraudulent under section 38–8–106(1).

On appeal, the broker argues that the trial court erred when it concluded that the distribution from the LLC to the garnishees was not a constructively fraudulent transfer.

## II. Preservation of Section 38–8–106(1) Claim

As a threshold matter, the LLC claims that the broker failed to preserve its claim under section 38–8–106(1). We disagree because we conclude that the parties tried this issue by consent.

■ "In a garnishment proceeding, the answer to the writ and traverse frame the issues." *Conn. Gen. Life Ins. Co. v. A.A.A. Waterproofing, Inc.*, 911 P.2d 684, 687 (Colo. App.1995). Nevertheless, C.R.C.P. 15 states that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Despite any defect in the pleadings, an issue is deemed properly before the

court where it has been tried before the court without timely objection or motion. *See, e.g., Great Am. Ins. Co. v. Ferndale Dev. Co.*, 185 Colo. 252, 254–55, 523 P.2d 979, 980 (Colo.1974); *Kennedy v. Aerr Co.*, 833 P.2d 807, 809 (Colo.App.1991).

■ Here, the broker did not specifically raise section 38–8–106(1) in its traverse of the garnishment or its opening statement. However, the broker's motion broadly claimed that "[the LLC's] distribution of assets to [the garnishees] was a fraudulent transfer and is voidable under CUFTA."

In its trial brief, the broker specifically argued that the transfer was voidable under section 38–8–106(1). At trial, counsel for both parties asked all three witnesses questions pertaining to the LLC's insolvency, which is an issue relevant to the resolution of claims under section 38–8–106(1). In closing argument, counsel for the broker quoted section 38–8–106(1), stated that it was not "a throw away provision under CUFTA," and argued that the LLC's intent was irrelevant under this provision. In response, Hatch's attorney argued that, under both sections 38–8–105(1)(b)(I), (II) and –106(1), the broker failed to prove that the LLC did not receive reasonably equivalent value for the transfer.

Under these circumstances, the issue concerning section 38–8–106(1) was tried by the consent of the parties, and was properly before the court. Hence, we consider the broker's arguments under sections 38–8–105(1)(b)(I), (II), and –106(1).

### III. Legal Background

CUFTA's purpose is to protect a debtor's estate from certain depletions that prejudice the debtor's unsecured creditors. *See Leverage Leasing Co. v. Smith*, 143 P.3d 1164, 1167 (Colo.App.2006). By establishing that a transfer is fraudulent, a creditor may be entitled to remedies, including avoiding the transfer "to the extent necessary to satisfy the creditor's claim." § 38–8–108(1)(a), C.R.S.2009.

There are three common sources of guidance to which we can look when interpreting CUFTA. First, because CUFTA was derived from the Uniform Fraudulent Transfer Act (UFTA), *Leverage Leasing*, 143 P.3d at 1166, we may consult cases decided under other states' versions of UFTA for assistance. § 38–8–112, C.R.S.2009 ("This article shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this article."); *see In re Knippen*, 355 B.R. 710, 732 (Bankr. N.D.Ill.2006).

Second, because UFTA was derived from the Uniform Fraudulent Credit Act (UFCA), *Leverage Leasing*, 143 P.3d at 1166, we may turn to case law interpreting UFCA. *See* Prefatory Note, Uniform Fraudulent Transfer Act, § 38–8–101; *Sedwick v. Gwinn*, 73 Wash.App. 879, 873 P.2d 528, 531 (1994)("Cases decided under the UFCA are relevant when interpreting the UFTA because the Acts' provisions are essentially the same.").

Third, cases interpreting 11 U.S.C. § 548(a)(1)(B)(i)-(ii) of the Bankruptcy Code, which also deals with fraudulent transfers, are persuasive when analyzing sections 38–8–105(1) and –106. *See* Prefatory Note, Uniform Fraudulent Transfer Act, § 38–8–101; *Schempp v. Lucre Mgmt. Group, LLC*, 18 P.3d 762, 764 (Colo.App.2000) (*Schempp I*)(§ 548 contains language that is "very similar" to section 38–8–105(1)(b), and it serves the same purpose, so judicial interpretations of § 548 are instructive).

### IV. Constructive Fraud

#### A. Introduction

■ A creditor may show, under sections 38–8–105(1)(b)(I) and (II), or –106, that a transfer was constructively fraudulent. *See In re Unglaub*, 332 B.R. 303, 315 (Bankr. N.D.Ill.2005). The prohibition of constructive fraud "operates to avoid transfers motivated by generosity, rather than fraud, reflecting the policy that an insolvent [an entity or a person] should be 'just to his creditors before he is generous to others.'" *In re Bloch*, 207 B.R. 944, 947 (D.Colo.1997) (quoting *In re Newman*, 203 B.R. 468, 473 (D.Kan. 1996) ).

A creditor may prove the general theory of constructive fraud in three specific ways under CUFTA. *See* Prefatory Note, Uniform

Fraudulent Transfer Act, § 38–8–101. Two of these ways are found in section 38–8–105(1)(b)(I) and (II), which pertain to creditors' claims that arise *before or after* the transfer. A creditor relying on these versions of constructive fraud must show that the debtor did not receive "reasonably equivalent value" for the transfer, and either that, in subsection (b)(I) the debtor's remaining assets were "unreasonably small" in light of the debtor's business; or in subsection (b)(II) the debtor "intended to incur, or believed or reasonably should have believed that he would incur" debts beyond the debtor's ability to pay them as they became due. § 38–8–105(1)(b)(I), (II).

The variety of constructive fraud found in section 38–8–106(1) only applies to creditors whose claims existed *before* the transfer. Under that statute, a creditor may show that the debtor did not receive reasonably equivalent value for the transfer and that the transfer rendered the debtor insolvent.

### B. Standard of Review

■ Generally, whether a transfer is fraudulent is a question of fact. *Certain Underwriters at Lloyd's, London v. Cooperman,* 289 Conn. 383, 957 A.2d 836, 843 (2008) (UFTA case). Accordingly, whether a creditor has established the components of constructive fraud is likewise a question of fact. *E.g., In re Bay Vista of Va., Inc.,* 428 B.R. 197, 225 (Bankr.E.D.Va.2010) ("unreasonably small" assets)(§ 548 case); *In re Gluth Bros. Constr., Inc.,* 424 B.R. 368, 376 (Bankr. N.D.Ill.2009) ("reasonably equivalent value") (UFTA case); *In re Phillips,* 379 B.R. 765, 779 (Bankr.N.D.Ill.2007) (insolvency).

The weight to be accorded the evidence is committed to the sound discretion of the trial court. The factual findings of the trial court will not be disturbed on appeal if they are supported by the evidence. *Schempp I,* 18 P.3d at 766. We review a court's application of a legal standard to the facts of the case de novo because it is a question of law. *See Corsentino v. Cordova,* 4 P.3d 1082, 1087 (Colo.2000).

### C. Reasonably Equivalent Value

The question whether a debtor received reasonably equivalent value for a transfer applies to all three forms of constructive fraud. Here, the trial court initially found that the distribution to the garnishees was for reasonably equivalent value. The court subsequently stated, after considering case citations supplied by the broker in a motion for reconsideration: "I concede that those cases seem to indicate that I was wrong in concluding that the distributions here were for reasonably equivalent value." The trial court then proceeded, however, to list other factors the broker needed to prove "in order to prevail under [section] 38–8–105(1)(b)."

The parties disagree about what the court's "concession" means. The broker treats this statement as a definitive finding that the distributions were not for reasonably equivalent value. The garnishees contend that the trial court was right when it initially found that the transfers were for reasonably equivalent value.

We read the trial court's statement as recognition that it may have erred in its original ruling concerning reasonably equivalent value, but that it decided to resolve the case by focusing on the other elements of the constructive fraud analysis. Because we affirm the trial court's judgment based on our conclusion that those other elements were not satisfied, we need not reach this issue.

### V. The LLC's Financial Condition— General Principles

The effect of the distribution on the LLC's financial condition potentially involves all three forms of constructive fraud. First, under section 38–8–105(1)(b)(I), was the $200,000 reserve asset "unreasonably small" in relation to the potential debt that the LLC owed the broker? Second, under section 38–8–105(1)(b)(II), did the garnishees, as members of the LLC, intend to incur, believe, or should they reasonably have believed, that the LLC would incur a potential debt beyond its ability to pay when the debt came due? Third, under section 38–8–106(1), was the LLC insolvent at the time of the distribution or did it become insolvent because of the distribution?

Here, the trial court denied the broker's request for relief because it found that the broker had not proved that the $200,000 reserve asset was unreasonable:

> If the reserve was reasonable, then [the LLC] was not undercapitalized at the moment of the distributions, within the meaning of section 38–8–105(1)(b)(I). Likewise, if the reserve was reasonable, then even if [the LLC] was rendered insolvent in the bankruptcy sense by the distributions (which it seems to have been), [the LLC] did not intend that result, precisely because it reserved an amount that, in my judgment, any reasonable debtor would have thought sufficient to keep it solvent despite the distributions. Indeed, saying that the reserve was "reasonable" is a shorthand way of saying [the LLC] retained sufficient capital (at least looking forward rather than backward) and never intended to render itself insolvent.

Although the trial court did not explicitly refer to section 38–8–106(1), the references to "insolvency" implicate that section.

### A. Standards for Calculating a Debtor's Financial Condition

#### 1. Unreasonably Small Assets under Section 38–8–105(1)(b)(I)

▇▇▇ The unreasonably small assets test "denotes a financial condition short of insolvency." *In re Fidelity Bond & Mortgage Co.*, 340 B.R. 266, 294 (Bankr.E.D.Pa. 2006)(UFTA case). The test "considers whether the transfer in question left the [d]ebtor with an 'inability to generate sufficient profits to sustain operations.'" *Id.* (quoting *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir.1992)). Under this test, courts consider whether the transfer put the debtor on "the road to ruin," *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 76 (N.D.Ill.2002) (UFCA case), or whether it left "the transferor technically solvent but doomed to fail." *MFS/Sun Life Trust— High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 944 (S.D.N.Y. 1995) (citing *Moody* ).

▇▇▇ The unreasonably small assets test "applies when the debtor is left with unrea-

sonably small assets, compared to his historical level of assets or cash flow and current needs." *Aristocrat Lakewood Nursing Home v. Mayne*, 133 Ohio App.3d 651, 729 N.E.2d 768, 780 (1999) (UFTA case). "[A] transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency, not necessarily a likelihood of insolvency." *In re Healthco Int'l, Inc.*, 208 B.R. 288, 302 (Bankr.D.Mass. 1997).

The unreasonably small assets test is not the same as the test for insolvency under section 38–8–106(1). *See In re WCC Holding Corp.*, 171 B.R. 972, 986 (Bankr.N.D.Tex. 1994) ("The concept of unreasonably small assets is separate and distinct from insolvency. If these concepts were interchangeable, one would expect the Legislature to have employed the same language."); Lee B. Shepard, *Beyond* Moody: *A Re–Examination of Unreasonably Small Capital,* 57 Hastings L.J. 891, 906–12 (2006); Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital,* 21 Ind. L. Rev. 469, 492–93 (1988) (equating insolvency with unreasonably small assets "does violence to the carefully structured standing rules applicable to fraudulent transfers and achieves results inconsistent with the UFCA's original intent").

▇▇▇ The proper test is "reasonable forseeability." *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 397 (Bankr. S.D.Tex.2008).

> Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses.

*Moody,* 971 F.2d at 1073.

#### 2. Debts Beyond the Ability to Pay under Section 38–8–105(1)(b)(II)

▇▇▇ A creditor may prevail if it can show that the debtor "[i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they came due." § 38–8– 105(1)(b)(II). "This test measures whether

the debtor, as a going concern, would reasonably have been seen as able to pay its debts after making the questionable transfer." *In re Pajaro Dunes Rental Agency, Inc.,* 174 B.R. 557, 593 (Bankr.N.D.Cal.1994) (UFTA case). In the present case, this test is very similar to the unreasonably small assets test, as there is only one debt—the broker's commission claim—that the LLC must "reasonably" have been able to pay.

### 3. Insolvency under Section 38–8–106(1)

Insolvency is defined for the purposes of CUFTA in section 38–8–103(1), C.R.S.2009: "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."

The official comment to CUFTA states that section 38–8–103(1) "contemplate[s] a fair valuation of the debts as well as the assets of the debtor." *Id.* at com. (1). "This definition of insolvency mirrors the balance-sheet test for insolvency under the Bankruptcy Code." *In re Unglaub,* 332 B.R. at 317; *see also In re Healthco,* 208 B.R. at 301 (§ 548 and UFTA case stating that insolvency has a settled meaning).

■■■ There is no need to prove fraudulent intent in order to establish constructive fraud under section 38–8–106(1). *See Gen. Trading Inc. v. Yale Materials Handling Corp.,* 119 F.3d 1485, 1499 (11th Cir.1997) (UFTA case). One court has observed that UFTA's equivalent of section 38–8–106(1) "makes no mention of the debtor's knowledge or reasonableness of estimation in relation to its own insolvency. As framed by the statute, the only question is whether the debtor was insolvent on the transfer date or became insolvent." *In re W.R. Grace & Co.,* 281 B.R. 852, 857 (Bankr.D.Del.2002).

## B. Considering Intent

■■■ Actual fraud, which is not at issue here, requires proof that a debtor "actual[ly] inten[ded] to hinder, delay, or defraud" a creditor. § 38–8–105(1)(a), C.R.S.2009. However, proof of the debtor's actual intent is not necessary to prove constructive fraud. *Leverage Leasing,* 143 P.3d at 1167. This means that

[t]he focus in the inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency [is] required. Culpability on the part of the ... transferees is not essential.

Unlike constructively fraudulent transfers, the adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question whether the transfer is actually fraudulent.... Conversely, the [debtor's] intent is immaterial to the constructively fraudulent transfer in which the issue is the equivalence of the consideration coupled with either insolvency, or inadequacy of remaining capital, or inability to pay debts as they mature.

*In re Cohen,* 199 B.R. 709, 716–17 (9th Cir. BAP1996).

■■■ Although the creditor is not required to show that the debtor actually intended to hinder, delay, or defraud him or her to prove constructive fraud, section 38–8–105(1)(b)(II) allows a court to assess a debtor's intent in a different context. This is so because it states that a transfer is constructively fraudulent if the debtor "*[i]ntended* to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they came due." (Emphasis supplied.)

A division of this court has stated that section 38–8–105(1)(b) "does not require proof of intent." *Leverage Leasing,* 143 P.3d at 1167. When read in context, it is clear, for two reasons, that this statement from *Leverage Leasing* was not aimed at reading the language "intended to incur" out of section 38–8–105(1)(b)(II). This statement merely recognized that proof of intent to hinder, delay, or defraud a creditor is only necessary to prove actual fraud under section 38–8–105(1)(a), and is not necessary to prove constructive fraud under section 38–8–105(1)(b).

Further, the issue in *Leverage Leasing* was whether a transfer of an asset was for reasonably equivalent value. The division noted that, under CUFTA, any inquiry into the good faith of either party is irrelevant to a determination of whether there was reasonably equivalent value. *Id.* at 1166–67. Thus, *Leverage Leasing* does not address the role

of a debtor's intent under section 38–8–105(1)(b)(II).

 The proper test under that section involves both a subjective and an objective prong, which is satisfied if either prong is proved. *See ASARCO*, 396 B.R. at 399; *see also In re Taubman*, 160 B.R. 964, 986–87 (Bankr.S.D.Ohio 1993) (debtor's intent under this form of constructive fraud is subjective). The subjective prong involves proof that the debtor made the transfer with the intent or belief that subsequent creditors would not be paid as their claims came due. *ASARCO*, 396 B.R. at 399. There must be evidence to show that, contemporaneously with the transfer, the debtor had "an intent or belief that [its] subsequent creditors would be injured, i.e., that the debtor would be unable to pay such debts as they matured." *Id.* (quoting *In re Suburban Motor Freight, Inc.*, 124 B.R. 984, 994 (Bankr.S.D.Ohio 1990)).

 The objective prong asks whether the debtor "would reasonably have been seen as able to pay its debts after making the challenged transfer." *ASARCO*, 396 B.R. at 400; *In re Pajaro Dunes*, 174 B.R. at 593. This does not mean that a debtor accumulated debts beyond the total of his or her assets, or that the debtor could not immediately pay his or her debts in full. Rather, this test focuses on whether the debtor could reasonably pay debts as they came due. *In re Kirkpatrick*, 254 B.R. 378, 385–86 (Bankr. N.D.Ohio 2000) (UFTA case); *In re Pajaro Dunes*, 174 B.R. at 593. To do so, the finder of fact must focus on what the debtor's intentions and expectations were at the time of the transfer, not at some later time. *In re Pajaro Dunes*, 174 B.R. at 593. Indeed, the reasonableness of a debtor's ability to pay its debts

is often measured through the use of cash flow projections and other forward-looking sources of evidence available to the debtor and its creditors at the time of the transfer. If these sources were flawed and overly optimistic from the beginning, then they were unreasonable. However, if they were improvident only in light of interven-

ing circumstances ... then the "reasonable ability" test has not been violated.

*Id.*

### C. Proving Insolvency

While an insolvency determination measures a debtor's assets against its liabilities at a "fair valuation," section 38–8–103(1), such determination will depend on whether the liability is certain or contingent. There is no dispute that here, at the time of the transfer, the broker had a "claim" under section 38–8–102(3), C.R.S.2009 (definition of "claim"), against the LLC. However, no judgment existed at the time of the transfer, and the trial court found that the parties had a bona fide dispute over whether the claim should be paid at all. Hence, the nature of the broker's claim was contingent. *See In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1335 (11th Cir.2007) (a pending lawsuit is a "prototypical" contingent liability); *Paratransit Risk Retention Group Ins. Co. v. Kamins*, 160 P.3d 307, 316 (Colo.App.2007) (observing that a disputed debt was contingent because it was not owed until resolution of the legal action). "[A] contingent liability is not certain—and often is highly unlikely—ever to become an actual liability." *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988).

According to the Eleventh Circuit,

[t]he "fair value" of a contingent liability, of course, should be discounted according to the possibility of its ever becoming real. Thus in this case the bankruptcy court should have estimated the expected value of a judgment against [the debtor], and then multiplied that value by the chance that [the debtor] would face such a judgment.

*In re Advanced Telecomm.*, 490 F.3d at 1335.

 Liabilities "must be reduced to [their] present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities." *Id.* (quoting *In re Xonics Photochemical*, 841 F.2d at 200); *see generally* Richard M. Cieri & Michael J. Riela, *Protecting Directors and Officers of Corporations that are Insolvent or in the Zone or Vicinity of Insolvency: Important Considerations, Practical Solutions*, 2

DePaul Bus. & Com. L.J. 295, 309–10 (2004) ("Some courts have valued contingent liabilities at their full face value. However, most courts rightly discount contingent liabilities by their probability of success."); John E. Sullivan III, *Future Credits and Fraudulent Transfers: When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner*, 22 Del. J. Corp. L. 955, 1007–08 (1997) (explaining how insolvency's "fair valuation" test is rooted in reasonableness).

### D. Timing

■ All three of the constructive fraud analyses described above focus on what is known at the time of the transfer. "A conveyance cannot become fraudulent at some point after its occurrence. It must be either fraudulent or non-fraudulent when executed." *Turk v. I.R.S.*, 127 F.Supp.2d 1165, 1169 (D.Mont.2000) (UFTA case).

■ In applying the unreasonably small assets test, the court "must re-create the financial condition of [the debtor] at the time when the transfer took place." *In re Pajaro Dunes*, 174 B.R. at 591; *see also Moody*, 971 F.2d at 1075.

■ For the test under section 38–8–105(1)(b)(II), which asks whether the debtor intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due, reasonableness is measured "on the date of the challenged transfer." *In re WCC Holding Corp.*, 171 B.R. at 986.

■ "[I]n order to apply a 'balance sheet' test [for insolvency], the [c]ourt must determine the 'fair value' of [the debtor's] assets and the extent of its liabilities at the time of each contested transfer." *In re Sheffield Steel Corp.*, 320 B.R. 423, 443 (Bankr. N.D.Okla.2004) (UFTA case); *but see In re W.R. Grace & Co.*, 281 B.R. at 868–69 (mass tort case in which bankruptcy court held that asbestos tort claims that had not been brought against the debtor at the time of the transfer should be counted as liabilities for an insolvency analysis under UFTA's equivalent of section 38–8–106(1)).

### VI. The LLC's Financial Condition— Application of Principles

#### A. Trial Court's Factual Findings

The trial court began its analysis by drawing attention to what it believed was the central question in the case, which was whether the $200,000 reserve asset was "reasonable in amount under all of the circumstances," essentially considering whether the LLC had made a "reasonable estimate of liability." In addition to the findings quoted above, the court made the following findings and legal observations:

- The garnishees' testimony was credible. The court said: "I don't think they had any intentions of defrauding or hindering the [broker]."

- It was persuaded by the garnishees' testimony that they expected the case to settle because Student and Swan were good friends who had discussed settling the commission claim.

- The parties all worked in an area in which businesses "have to deal with each other over and over again," and that these cases "almost always settle, especially in this relatively small amount."

- "[N]o case law exists requiring an LLC, when making a reserve like [the LLC's], to pay the first dollar out in their own attorney's fees when they're litigating the very validity of the claim."

- The broker's expert was not convincing.

- It was "hard[ ]" to calculate the potential liability in light of the prospect of settlement, on the one hand, and the total of the commission, arbitration costs, and attorney fees, on the other.

- The LLC began to incur attorney fees "more than a year" after the reserve asset had been created.

- Although, as a matter of hindsight, the $200,000 reserve was inadequate to pay the broker's arbitration judgment, it was not unreasonably small at the time it was created, and that the garnishees' belief that $200,000 would have resolved the dispute was not unreasonable.

Although not expressly mentioned in the trial court's findings, the record contained additional evidence that supported them. For example, there was evidence that Hatch took steps at the time of the formation of the reserve asset to ensure that it exceeded the existing liabilities. Hatch interviewed one of the buyer's representatives and was told that the broker had not negotiated with the buyer.

The size of the reserve asset—$200,000—was greater than the $177,000 commission, and it would therefore allow Student to negotiate a settlement with the broker. There was evidence to support the garnishees' belief that the broker would settle for less than the full amount based on Swan's statement that the dispute could be settled for $88,500. Student tendered a check to Swan in that amount as an offer to settle the dispute. Last, Hatch, an experienced real estate attorney, had never seen a dispute of this nature go to the lengths that this one did.

### B. Section 38–8–105(1)(b)(I): Unreasonably Small Assets

We conclude that, by referring to the reasonableness of the size of the asset, the trial court applied the proper legal standard when considering this form of constructive fraud. Further, we conclude that trial court's findings, including its finding that the size of the asset was reasonable, support its ultimate finding that the reserve asset was not unreasonably small. Applying the proper test, this means that the broker did not show that the garnishees should have reasonably foreseen that the distribution would create an unreasonable risk of insolvency. *See ASARCO*, 396 B.R. at 397; *In re Healthco*, 208 B.R. at 302.

### C. Section 38–8–105(1)(b)(II): Incurring Debts

We conclude that the trial court applied the proper legal standard concerning this variety of constructive fraud and that its factual findings are supported by evidence in the record. The trial court's findings establish that it considered the proper law concerning this form of constructive fraud, because they address both the subjective and objective prongs. *See ASARCO*, 396 B.R. at 399. The court's discussion of the garnishees' intent was relevant to the subjective prong because it constituted a finding that, at the time of the distribution, the garnishees did not have an intent or belief that the LLC would be unable to pay the entire commission at the time it matured. *Id.*

The court's statement that the size of the reserve asset was reasonable pertained to the objective prong because it constituted a finding that, at the time of the transfer, the LLC would have been reasonably able to pay the entire commission as it came due. The court's statement also indicated that it found that intervening circumstances, such as the broker's unwillingness to settle, or, in Hatch's experience, the unprecedented progression of the dispute through litigation, caused the size of the reserve asset to become "improvident." *See In re Pajaro Dunes*, 174 B.R. at 593.

### D. Section 38–8–106(1): Insolvency

The broker contends that the trial court found that the distribution rendered the LLC insolvent. Therefore, the broker further argues that the only reason that the trial court did not find that the broker had proved constructive fraud under section 38–8–106(1) was that it found that the garnishees did not intend to render the LLC insolvent by the distribution. Thus, the broker's argument concludes, the trial court applied an improper legal test. We disagree, because we conclude that the trial court applied the proper test, and we further conclude that the trial court's factual findings when applying this test are supported by the record.

First, as we have indicated above, the trial court's findings concerning the garnishees' intent were connected to the subjective prong of the form of constructive fraud found in section 38–8–105(1)(b)(II).

Second, the court's findings included the statement that the reserve asset, "looking forward rather than backward," was sufficient and reasonable to keep the LLC solvent despite the distribution. This is an accurate application of the law, particularly considering that the court was required to

determine the value of the reserve asset and the extent of the LLC's liability to the broker at the time of the distribution. *See In re Sheffield Steel Corp.*, 320 B.R. at 443.

The value of the reserve asset was greater than the value of the commission. The trial court's factual findings indicate that, at the time the distribution occurred, the likelihood that the dispute would reach the result found by the arbitrator—the contingent liability— was uncertain. *See In re Advanced Telecomm.*, 490 F.3d at 1335; *In re Xonics Photochemical, Inc.*, 841 F.2d at 200.

In light of the entire order, we conclude that the trial court's statement that the LLC was "rendered insolvent" by the distribution is a reference to the effect that the distribution had on the assets of the LLC at the time of the arbitration, and not to the effect of the distribution at the time it was made. Indeed, until the arbitration began and attorney fees were generated, which was about a year after the distribution, the $200,000 reserve asset remained large enough to pay the entire commission of $177,000, plus one year of interest at 12%, which would be $21,240.

The judgment is affirmed.

Judge LICHTENSTEIN and Judge CONNELLY concur.